147 T.C. No. 16

UNITED STATES TAX COURT

LAWRENCE G. GRAEV AND LORNA GRAEV, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30638-08.                          Filed November 30, 2016.

Ps claimed on their 2004 income tax return a charitable contribution deduction for the donation of a facade easement to NAT and claimed on their 2005 return a carryover of a portion of that deduction. R's examining agent determined to disallow Ps' claimed charitable contribution deductions and also determined that Ps were liable for the 40% gross valuation misstatement penalty under I.R.C. sec. 6662(h). He prepared a penalty approval form for which he obtained written approval from his immediate supervisor, and on that form only the 40% penalty under I.R.C. sec. 6662(h) was asserted. He prepared a notice of deficiency that included the 40% penalty; but before the notice was issued, a Chief Counsel attorney reviewed a draft of the notice. Through a memorandum approved by his supervisor, the attorney advised that an alternative 20% penalty under I.R.C. sec. 6662(a) should be added to the notice. The notice of deficiency was then revised to include the 20% I.R.C. sec. 6662(a) accuracy-related penalty (setting out the calculation to yield a zero 20% penalty to avoid stacking with the 40% penalty) and was issued as revised (but with no further approval from the examining agent's

supervisor). In this litigation R concedes liability for the 40% penalty but continues to assert the alternative 20% penalty as a nonzero amount.

Ps contend that R failed to comply with the requirements of I.R.C. sec. 6751 as to the alternative 20% penalty--i.e., that a computation of the penalty be included in the notice of deficiency, I.R.C. sec. 6751(a), and that the "initial determination of * * * [the] assessment" of the penalty be "personally approved (in writing) by the immediate supervisor * * * or such higher level official as the Secretary may designate", I.R.C. sec. 6751(b)(1)--and that these failures bar the assessment of that 20% penalty.

Held: The notice of deficiency complied with I.R.C. sec. 6751(a).

Held, further, because R has not yet assessed any 20% penalty, Ps' argument that R failed to comply with I.R.C. sec. 6751(b)(1) is premature.

Held, further, the 20% accuracy-related penalty for a substantial understatement of income tax is sustained for 2004 and 2005.

Frank Agostino, Brian D. Burton, Jeremy M. Klausner, and Lawrence A. Sannicandro, for petitioners.

Shawna A. Early, for respondent.

OPINION

THORNTON, Judge:  Pursuant to section 6212(a),[1] respondent determined deficiencies in tax for petitioners, Lawrence and Lorna Graev, of $237,481 for 2004 and $412,620 for 2005, resulting from the disallowance of charitable contribution deductions the Graevs claimed for those years.  Respondent also determined that Mr. and Mrs. Graev are liable for accuracy-related penalties of 40% under section 6662(h) and alternatively of 20% under section 6662(a) for 2004 and 2005.  (We hereafter sometimes refer to these as the 40% penalty and the 20% penalty.)

Mr. and Mrs. Graev petitioned this Court, pursuant to section 6213(a), to redetermine these deficiencies and penalties.  Pursuant to the parties' stipulation, the 40% penalty is no longer at issue, but the alternative 20% penalty remains in dispute.  On June 24, 2013, the Court issued an Opinion sustaining respondent's disallowance of the charitable contribution deductions.  See Graev v. Commissioner (Graev I), 140 T.C. 377 (2013).

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

Now we must decide whether the Graevs are liable for the 20% penalty. This inquiry involves threshold issues as to whether respondent failed to include a computation of the 20% penalty in the notice of deficiency, as required by section 6751(a), and whether respondent is barred from assessing this penalty because of a lack of proper written approval for assessment of the penalty, as required by section 6751(b)(1). We hold that the notice of deficiency complied with section 6751(a) and that petitioners' argument that respondent failed to comply with section 6751(b) is premature. Concluding that petitioners have failed to show reasonable cause and good faith under section 6664(c), substantial authority under section 6662(d)(2)(B)(i), or adequate disclosure and reasonable basis for the return position under section 6662(d)(2)(B)(ii), we hold that petitioners are liable for the 20% penalty for an underpayment attributable to a substantial understatement of income tax for each year.

## Background

The parties submitted the penalty issues fully stipulated pursuant to Rule 122, reflecting their agreement that the relevant facts could be presented without a trial. Our Opinion in Graev I provides a detailed factual background of the Graevs' contribution of a facade easement to the National Architectural Trust (NAT). Therefore we will discuss only briefly the contribution of the easement

and will discuss in more detail additional facts relevant to petitioners' defenses to the 20% penalty.

<u>The Property</u>

In 1999 Mr. Graev purchased property in a historic preservation district in New York, New York, for $4.3 million. The property is listed on the National Register of Historic Places. On December 17, 2004, Mr. Graev executed documents donating a facade conservation easement to NAT. Petitioners received an extension of time to file their 2004 Federal income tax return until October 15, 2005; in their timely filed 2004 Form 1040, U.S. Individual Income Tax Return, petitioners claimed a charitable contribution deduction for this easement donation.

<u>NAT's Solicitation</u>

In the summer of 2004 a representative from NAT contacted Mr. Graev regarding a potential easement donation to NAT. Mr. Graev became aware that he had a neighbor who had contributed a facade easement to NAT and who had received from NAT a "side letter" that promised return of contributions if deductions were disallowed. Mr. Graev evidently expressed to NAT an interest in making an easement contribution like his neighbor's, but on September 15, 2004, he sent an email to NAT explaining a concern that had arisen:

My accountants have referred me to Notice 2004-41 * * * issued by the IRS on June 30, 2004, in which the IRS has indicated that it will, in "appropriate cases", disallow charitable deductions to organizations that promote conservation easements and may impose penalties and excise taxes on the taxpayer. They have not advised me to abandon this idea, but they have advised me to be very cautious. What are your thoughts especially as it relates to the side letter, etc.

(The "side letter" to which Mr. Graev referred was NAT's comfort letter indicating that it would refund a contribution in the event that the favorable tax results anticipated from a contribution were not achieved.) As stated in Graev I, 140 T.C at 381-382: "On his tax returns Mr. Graev listed his occupation as 'attorney', and we infer that he is an individual of above-average sophistication who, with the help of his accountants, was capable of identifying tax risks. We find that Mr. Graev did in fact identify non-negligible risks regarding the deductibility of facade easements, as evidenced by his September 15 email and subsequent dealings with NAT."[2]

In response to Mr. Graev's concerns, NAT sent him an email dated September 16, 2004, stating:

The IRS notices to which you refer were prompted by recently exposed improprieties at the Nature Conservancy, the nation's largest land conservation easement holding organization. The practice the IRS is concerned with here is when a non-profit acquires property,

---

[2]Mr. Graev is an experienced attorney who has worked for prestigious law firms.

puts an easement on it and sells it for a reduced price plus a tax deductible charitable contribution. * * *

It is important to distinguish between these activities, which certainly warrant scrutiny, and those engaged in by the National Architectural Trust. * * * We have been in contact with the IRS since the notices were issued and, based upon our discussion with them, have no reason to expect that we or any of the donations we have received (easement or cash) will be reviewed.

Thus far not a single donation made to the Trust has been disallowed by the IRS (400+ in New York City alone). * * *

Our attorneys at Venable in Washington DC have analyzed the form and substance of cash donations made to us in connection with facade conservation easement donations and have concluded that they met the tests that would qualify them as tax-deductible. * * * I would be glad to fax you a copy of this opinion letter should you wish to read it.

With respect to the side letter, we don't believe they compromise the tax-deductibility of cash donations in the present tax year * * *. However, we do not believe this would be the case with a legal agreement that explicitly made the cash donation contingent on the survival of the deduction.

There is no record of Mr. Graev's requesting the Venable opinion letter. We find that he neither requested it nor attempted to rely upon it to support his claimed charitable contribution deductions.

On September 20, 2004, Mr. Graev executed a facade conservation easement application to NAT, stating on its cover that "[he] will also be looking for the NAT to issue the 'side' letter we discussed (similar to the one being issued

to my neighbor across the street)". On the bottom of the first page of the application, NAT italicized the last sentence: "The National Architectural Trust recommends that you seek professional advice to assess the specific legal and tax considerations of making your easement donation."

The Side Letter

An internal email message dated September 23, 2004, from a NAT representative to NAT's president, indicated that a representative had "discussed with * * * [Mr. Graev the] potential deductibility issues related to placing any contingencies on the cash donation. * * * [Mr. Graev] understands the risk and would like to receive the * * * [side letter]." The side letter was sent on September 24, 2004. In pertinent part, it read:

> 1. In the event the IRS challenges the appraisal of your facade conservation easement and the tax deductions derived therefrom are reduced as a result, we will make a proportionate reduction to your cash endowment contribution and promptly refund the difference to you.
>
> 2. In the event the IRS disallows the tax deductions in their entirety, we will promptly refund your entire cash endowment contribution and join with you to immediately remove the facade conservation easement from the property's title.

Regarding NAT's representations in this side letter, in Graev I, 140 T.C. at 383, we found that "there was at least a non-negligible possibility, if the IRS

successfully disallowed Mr. Graev's easement contribution deduction, that NAT would do what it said it would do."

Communication With NAT

On October 13, 2004, NAT sent to Mr. Graev a letter notifying him that his facade conservation easement application had been approved. It was accompanied by a draft deed of easement; NAT encouraged him to review it and "speak to * * * [his] tax and legal advisors * * * about * * * [his] facade conservation easement donation and the related tax advantages." The letter encouraged those tax and legal advisers to contact NAT if there were any questions or concerns. Nothing in the record indicates that, as a result of this letter, Mr. Graev sought advice regarding the "tax advantages" of the facade conservation easement donation.

Mr. Graev apparently sought legal counsel from Charles Weiss regarding the deed of easement. But the only communication in the record involving Mr. Weiss is a single fax on December 2, 2004, from Mr. Weiss to NAT. The fax asked that Mr. Weiss' suggested revisions to the deed of easement be incorporated and that the resulting version be returned for his review. NAT accordingly incorporated those "changes desired by * * * [Mr. Graev] and worked out by * * * [Mr. Weiss and NAT]." The final version included a clause stating that "nothing

herein contained shall be construed to limit * * * [NAT's] right to * * * abandon some or all of its rights hereunder".

On December 17, 2004, Mr. Graev sent to NAT the final documentation to complete his grant of a facade conservation easement to NAT. And on January 25, 2005, NAT sent Mr. Graev a letter thanking him for his conservation easement and cash contribution "made in 2004"; "certif[ying] that * * * [petitioners] have received no goods or services in return for * * * [their] gifts"; and purporting to attach a copy of the executed Form 8283, Noncash Charitable Contributions, to be included with petitioners' 2004 Form 1040.

On January 25, 2005, NAT sent Mr. Graev a second letter, again thanking him for his facade conservation easement. Substantively, however, the letter was cautionary: It was sent in response to a December 17, 2004, press release from the Senate Committee on Finance, indicating that the Internal Revenue Service (IRS) Commissioner would be called upon "to make review of facade easements a priority for audit." The letter quoted the press release as stating:

> The public is on notice that those increased and additional penalties [for promoting, participating in, or appraising facade conservation easements that are found to be significantly overvalued], as well as the possible reforms [in the current law regarding donation of facade easements that would limit the amount that could be deducted], will be effective today.

The NAT letter advised Mr. Graev that he should "seek counsel from * * * [his] tax advisor and independent appraiser to assist * * * [him] in assessing the potential effect on * * * [his donation] of this press announcement."  There is no evidence that petitioners took this advice.

On February 1, 2005, NAT sent its donors notice that on January 27, 2005, the Joint Committee on Taxation had issued a 435-page report titled "Options to Improve Tax Compliance and Reform Tax Expenditures", proposing to

> eliminate[] the charitable contribution deduction with respect to facade and conservation easements relating to personal residence properties, substantially reduce[] the deduction for all other qualified conservation contributions, and impose[] new standards on appraisals and appraisers regarding the valuation of such contributions.
>
> *        *        *        *        *        *        *
>
> The proposal is effective for contributions made in taxable years beginning after the date of enactment.
> [Staff of J. Comm. on Taxation, Options to Improve Tax Compliance and Reform Tax Expenditures 281, 284 (J. Comm. Print 2005).]

NAT recommended that the donors "seek counsel from * * * [their] tax advisor to assist * * * [them] in assessing the potential affect on * * * [them] of this proposed legislation."  On February 7, 2005, NAT mailed Mr. Graev another notice, reiterating and expanding upon the substance of its February 1 letter.  This notice recommended that Mr. Graev "obtain independent legal, financial and tax advice

to assess the potential impact of the above developments, if any, on * * * [his] donation." There is no evidence that petitioners sought counsel in response to either notice or the committee report.

On August 8, 2005, an internal email was sent to several NAT employees with respect to side letters such as the one provided to Mr. Graev. It stated:

> As you may be aware, our attorneys have informed us that by telling our donors that their cash contributions would be refunded in whole or in part if their tax deduction for the easement were reduced or disallowed by the Internal Revenue Service and/or an act of Congress we may have inadvertently adversely impacted the tax deductibility of their cash contribution. We have made this statement to some donors in a comfort letter and/or in the 2005 expedited processing addendum.
>
> *     *     *     *     *     *     *
>
> [W]e would like to send all letters [to the affected donors discussing this issue] out by Federal Express before the end of this week.

Attached to the email was a draft letter and a list of donors who received side letters and who would be receiving a version of the draft letter. Mr. Graev was included in the list. The letter that NAT sent Mr. Graev on August 8, 2005, stated:

> In connection with your donation of a facade conservation easement and cash contribution and per your request, we sent you a letter dated September 24, 2004, stating, among other things, that the cash contribution would be refunded in whole or in part if your tax deduction for the easement were reduced or disallowed by the Internal Revenue Service. It has recently been brought to our attention by our attorney that this offer of a refund may adversely affect the deductibility of the cash contribution as a charitable gift.

- 13 -

> The attorney has also advised that the offer of a refund should not impact the deductibility of your facade conservation easement donation.
>
> We urge you to contact your professional tax advisor to determine the actual impact of the refund offer. * * * [I]f you * * * prefer that we withdraw the refund offer, which according to our attorney should restore the deductibility of your cash contribution, the Trust will promptly do so.

On August 16, 2005, another internal NAT email was circulated; this email verified that Mr. Graev's letter had been sent. Nothing in the record indicates that petitioners sought or obtained independent legal advice as a result of this letter.

The Appraisal

On October 15, 2004, Miller Samuel, Inc., issued its appraisal report. The report was completed by Dina Miller; Jonathan Miller signed it as supervisor and checked the box indicating that he did not inspect the property. The appraisal report states: "The discussion provided herein is for general background, and the client must not rely on this addendum without seeking legal counsel for advice and updated information in these matters." It discusses generally section 170 and NAT's status as a 501(c)(3) nonprofit organization. It also states that "[n]o charitable deduction is allowed unless the mortgagee agrees to subordinate its rights to the property to the right of the donee to enforce the conservation purposes in perpetuity" and cites section 1.170A-14, Income Tax Regs., which includes

"(g) Enforceable in perpetuity.-- * * * (3) Remote future event". It does not, however, mention the side letter or its contents or opine on its impact on the deductibility of the appraised facade easement's donation.

Petitioners' Forms 1040

A certified public accountant (C.P.A.), Jerry Lerman, prepared petitioners' 2004 and 2005 joint tax returns. Petitioners had used Mr. Lerman's services since at least 1999, and he and Mr. Graev often spoke about tax matters. At some point, Mr. Graev had approached Mr. Lerman and asked generally about facade conservation contributions. After consulting the Code, the regulations, and various articles regarding the substantiation requirements for noncash charitable contributions over $5,000, Mr. Lerman "informed Mr. Graev that such donations were legitimate but were 'high visibility transactions' to the * * * [IRS]" and "provided Mr. Graev with then-applicable case law."[3]

The parties have stipulated that, in connection with preparing petitioners' 2004 Form 1040, Mr. Graev provided Mr. Lerman the following documents, among other items: (1) a copy of the executed Conservation Deed of Easement;

---

[3]Mr. Lerman's declaration, quoted above, does not otherwise identify the particular authorities or articles consulted or describe his ultimate advice. The parties stipulated that the matters asserted in Mr. Lerman's and Mr. Graev's declarations would have been their testimony at trial if there had been a trial.

(2) an executed Form NYC RPT-Real Property Transfer Tax Return; (3) an executed Department of Environmental Protection Customer Registration Form for Water and Sewer Billing; (4) an executed Form TP-584, Combined Real Estate Transfer Tax Return; (5) an executed National Park Service Historic Preservation Certification Application; (6) a Residential Appraisal Report from Miller Samuel, Inc.; and (7) an executed Form 8283, Noncash Charitable Contributions, evidencing the contributions, signed by NAT and Miller Samuel, Inc.[4]

According to his declaration, Mr. Lerman reviewed the documents listed above (except for the water and sewer billing registration form) to "ensure they were complete and that they satisfied the substantiation requirements for claiming the charitable contribution deduction as * * * [he] understood them."[5] And he "was comfortable that * * * [he] had the documentation necessary to substantiate Mr. Graev's charitable deduction for the cash and the facade conservation easement contributions. * * * [He] was also comfortable that the documentation

_____

[4]Although Messrs. Graev and Lerman state in their declarations that this list is not exhaustive, neither list mentions the side letter or its contents.

[5]The declaration does not specify whether Mr. Lerman reviewed the side letter or was made aware of its existence.

with respect to each deduction met IRS requirements."[6]  Mr. Lerman "would not have prepared Mr. Graev's 2004 and 2005 Forms 1040 if * * * [he] did not believe Mr. Graev was entitled to claim the charitable contribution deduction * * * for his facade easement donation to the Trust."

Petitioners' 2004 Form 1040, which petitioners signed on October 10, 2005, included charitable contribution deductions for the cash and the facade easement given to NAT.  Because of the limitations on charitable contribution deductions in section 170(b)(1)(C), petitioners could not claim the full amounts of the contributions.  As a result their 2005 Form 1040 reported a carryover charitable contribution for a large portion of the easement donation.

According to Mr. Graev's declaration, petitioners "relied on Mr. Lerman's judgment as to the propriety of claiming charitable deductions for the contribution of the conservation easement and the cash donation".

Initial Action by IRS Examination Personnel

Internal Revenue Agent Stephen Feld examined the Graevs' 2004 and 2005 tax returns, and sometime in 2008 he concluded that the charitable contribution deductions should be disallowed.  He also concluded that the 40% penalty should

---

[6]The declaration does not indicate whether Mr. Lerman was also comfortable that the side letter's existence would not defeat the deductions completely.

be asserted. Agent Feld prepared the appropriate "Penalty Approval Form" for the proposed 40% gross valuation misstatement penalty of section 6662(h).[7] The form did not include the 20% penalty for an underpayment attributable to negligence under section 6662(a) and (b)(1) or a substantial understatement of income tax under section 6662(a) and (b)(2).

Mr. Feld's immediate supervisor, John Post, approved the "Penalty Approval Form" as Mr. Feld had prepared it, in compliance with Internal Revenue Manual (IRM) part 20.1.1.2.3 (Feb. 22, 2008) and 20.1.5.1.6 (July 1, 2008). Mr. Post checked the "Approved" box (rather than the "Disapproved" box) and initialed the form in the space for "Group Manager Initials".

Mr. Feld prepared a proposed notice of deficiency determining the 40% penalty under section 6662(h) but no 20% penalty under section 6662(b).

Review by Chief Counsel

Mr. Feld's proposed notice of deficiency was referred to the Office of Chief Counsel for review, pursuant to IRM parts 4.8.9.7 (Dec. 1, 2006) and 33.1.2.8

_____

[7]The "Penalty Approval Form" was used in compliance with Internal Revenue Manual (IRM) pt. 20.1.5.1.6(4) (July 1, 2008) as then in effect ("[f]or SB/SE exam cases, written managerial approval should be documented on the Penalty Approval Form, workpaper 300"). The IRM does not have "the force or effect of law." Vallone v. Commissioner, 88 T.C. 794, 807 (1987). Unless otherwise noted, we cite in this Opinion the IRM provisions as in effect at the time of the relevant agency action.

(Aug. 11, 2004).  That review was conducted by Attorney Gerard Mackey, who prepared a memorandum to IRS Examination dated September 12, 2008, that stated:

> We have reviewed the proposed notice of deficiency for the named taxpayer and approve it as drafted except as noted below. * * *
>
> Please replace the penalty language on the Continuation Sheet with the following language:
>
> You are liable for the accuracy-related penalty imposed under I.R.C. § 6662(h) for the tax years ended December 31, 2004, and December 31, 2005, because it is determined that you had gross valuation misstatements on your returns.  Consequently, there is added to the tax an amount equal to 40 percent of the resulting underpayments of tax.  Alternatively, you are liable for the 20 percent accuracy-related penalty imposed under I.R.C. § 6662(a) for 2004 and 2005.
> [Emphasis added.]

The final sentence quoted above was new matter that had not been in the notice of deficiency that Mr. Feld had proposed and Mr. Post had approved.  Mr. Mackey signed the memorandum, and his immediate supervisor, Robert Baxer, initialed it.

Subsequent Action by IRS Examination Personnel

There is no indication that anyone in IRS Examination resisted the Office of Chief Counsel's advice to assert the alternative 20% accuracy-related penalties against the Graevs.  Rather, Mr. Feld revised the notice of deficiency to include

the alternative penalties. The parties stipulate, however, that Mr. Post did not approve the alternative penalties in writing.

On September 22, 2008, respondent issued a statutory notice of deficiency, revised as proposed by Mr. Mackey, that disallowed the Graevs' cash and noncash charitable contribution deductions relating to their contributions to NAT and determined deficiencies in tax and penalties for both 2004 and 2005. The notice included a text sentence originally proposed by Mr. Mackey and approved by Mr. Baxer that stated: "Alternatively, you are liable for the 20 percent accuracy-related penalty imposed under I.R.C. section 6662(a) for 2004 and 2005." The revised notice of deficiency was signed by Deborah Bennett, Technical Services Territory Manager.

For each of the two years, the notice of deficiency included a page on which the section 6662 accuracy-related penalties are calculated. The formula for the 20% penalty computation requires reducing the underpayment by amounts "attributable to Section 6662(h) penalty issues" (in order to avoid stacking both penalties on the same underpayment), so the "Underpayment to which Section 6662(a) applies" appears as zero, and the "Total section 6662(a) accuracy-related penalty" is likewise zero. In the section of the form for the 40% penalty of section 6662(h), the underpayment is appropriately not reduced by the alternative penalty,

and the computation yields an underpayment and a 40% penalty (i.e., of $76,085 for 2004 and $62,377 for 2005).

Tax Court Proceedings

Mr. and Mrs. Graev timely filed their petition in this Court on December 19, 2008. At that time, they resided in the State of New York. The petition alleges that respondent erred in disallowing the charitable contribution deductions, "erred in determining that Petitioners are liable for the 40% accuracy-related penalty under IRC Section 6662(h)", and "erred in determining that Petitioners are alternatively liable for the 20 percent accuracy-related penalty under IRC Section 6662(a)". Respondent's answer, filed in February 2009, denied the petition's allegations but made no affirmative allegations as to the penalty.

We resolved the charitable contribution deduction issue in Graev I in favor of respondent on the grounds that the side letter created a subsequent event; that the event's occurrence was not "so remote as to be negligible"; and that the charitable contribution deductions were, therefore, properly disallowed under sections 1.170A-1(e), 1.170A-7(a)(3), and 1.170A-14(g)(3), Income Tax Regs. Thereafter respondent "concede[d] that the valuation penalty pursuant to I.R.C. § 6662(h) is inapplicable" and, "in the alternative, maintain[ed] that the

accuracy-related penalty under I.R.C. 6662(a) as asserted in the notice of deficiency upon which this case is based applies".

In their motion for partial summary judgment, filed April 14, 2014, the Graevs raised, for the first time, the issue of respondent's compliance with section 6751(b). Respondent objected to petitioners' motion and subsequently, with leave of the Court, filed an amended answer affirmatively alleging that petitioners are liable for the 20% section 6662(a) penalty on the basis of negligence or disregard of rules or regulations, or on the basis of substantial understatements of income tax. That is, respondent principally contends that the 20% penalty was validly determined in the notice of deficiency, notwithstanding section 6751, and contends, in the alternative, that if it was not validly so determined in the notice, then the Court should determine it as an additional liability for each year pursuant to section 6214(a). On January 16, 2015, the Court denied without prejudice petitioners' motion for partial summary judgment, after the parties filed a motion to submit this case under Rule 122.

## Discussion

Before considering the merits of the 20% accuracy-related penalties determined against the Graevs, we first address threshold issues they have raised

involving the procedural requirements of section 6751(a), relating to penalty

computations, and section 6751(b), relating to penalty assessments.

I.      Penalty Computation Under Section 6751(a)

Section 6751(a) provides:

> SEC. 6751(a).  Computation of Penalty Included in Notice.--
> The Secretary shall include with each notice of penalty under this title
> information with respect to the name of the penalty, the section of this
> title under which the penalty is imposed, and a computation of the
> penalty.

Because the notice of deficiency shows a zero amount for the 20% penalty under

section 6662(a), the Graevs contend that the IRS failed to comply with the

requirements of section 6751(a).

We disagree.  The 20% and 40% penalties of subsections (a) and (h) of

section 6662 are alternatives.  Only one of these penalties can apply to a given

portion of a deficiency; they cannot be stacked.  See sec 1.6662-2(c), Income Tax

Regs.; see also Cooper v. Commissioner, 143 T.C. 194, 220 (2014).  Since the

40% penalty was the IRS' principal position and the 20% penalty appeared in the

notice of deficiency only as an alternative, the notice of deficiency correctly

calculated the amount of the 20% penalty as zero, rather than as a positive amount

that would have improperly added to the amount of the proposed assessment.  The

notice of deficiency clearly informed petitioners of the determination of the 20%

penalty (as an alternative) and clearly set out the computation (albeit reduced to zero, as it had to be then, to account for the greater 40% penalty). The notice of deficiency thus complied with section 6751(a).[8]

Moreover, even if petitioners were correct that the IRS failed to include a computation of a penalty as required by section 6751(a), such a failure would not invalidate a notice of deficiency. In similar contexts this Court has held that procedural errors or omissions are not a basis to invalidate an administrative act or proceeding unless there was prejudice to the complaining party. See John C. Hom & Assocs., Inc. v. Commissioner, 140 T.C. 210, 214 (2013) (failure to include the address and telephone number for the National Taxpayer Advocate, as required by section 6212(a), on a notice of deficiency); Nestor v. Commissioner, 118 T.C. 162, 167 (2002) (failure during a collection due process hearing to provide a taxpayer with a copy of the record of assessment); see also Boyd v. United States, 121 F. App'x 348, 350 (10th Cir. 2005) (failure to allow taxpayer to record collection due process hearing); Rochelle v. Commissioner, 116 T.C. 356, 363 (2001) (failure to

---

[8]In Legg v. Commissioner, 145 T.C. 344, 351 (2015), we held that "[t]he fact that respondent's examiner calculated the penalties at a lower [20%] rate does not nullify the 'initial determination' that petitioners were liable for the 40% gross valuation misstatement penalties." Likewise, the fact that the notice of deficiency issued to the Graevs calculated the penalties at the higher 40% rate does not nullify the assertion that the Graevs were liable for the 20% penalties.

provide due date for filing petition in notice of deficiency), aff'd, 293 F.3d 740 (5th Cir. 2002).  Additionally, the Supreme Court has held "that if a statute does not specify a consequence for noncompliance with * * * [a statutory provision], the federal courts will not in the ordinary course impose their own coercive sanction."  United States v. James Daniel Good Real Prop., 510 U.S. 43, 63 (1993), quoted in Nestor v. Commissioner, 118 T.C. at 174.

Section 6751(a) does not provide a "consequence for noncompliance" if the IRS fails to include a computation of the penalty in the notice.  Moreover, the Graevs have failed to explain how they were prejudiced by the IRS' failure to include a computation of the 20% penalty in the notice.  As we have discussed, the notice clearly informed the Graevs that the IRS was pursuing the 20% penalty, but it showed a zero amount for the 20% penalty because it was raised in the alternative and could not be stacked with the 40% penalty.

II.     Approval of Assessment Under Section 6751(b)(1)

Petitioners contend that the 20% penalty may not be assessed against them for either year at issue because respondent failed to comply with section 6751(b)(1), which generally requires supervisory approval of the "initial determination of * * * assessment" of penalties.  Petitioners assert that Agent Feld made the relevant "initial determination" and that his determination was to impose

the 40% penalty but not the 20% penalty. Consequently, petitioners contend, because the 20% penalty was not "determined" by Agent Feld and was not approved by his immediate supervisor, Mr. Post, the 20% penalty is not "assessable". Petitioners contend that this is so irrespective of Chief Counsel Attorney Mackey's later "determination" to include the 20% penalty in the notice of deficiency, because Attorney Mackey was not authorized to make such a determination.

Respondent makes four distinct and independent counterarguments. First: "Section 6751(b) requires written supervisory approval of the initial determination of a penalty assessment before the assessment is made. Because respondent has not yet assessed the section 6662 penalties at issue, it is premature to consider whether respondent has satisfied section 6751(b)." Second, respondent contends that in any event Attorney Mackey made the initial determination, as he was authorized to do, and it was approved in writing by his immediate supervisor, as section 6751(b) requires. Third, respondent contends, any perceived noncompliance with section 6751(b) is harmless error, since this Court's redetermination of the penalty in question will prevent any improper penalty from being assessed. Fourth, respondent contends that even if the Court were to determine that the 20% penalty could not be properly assessed on the basis of the

notice of deficiency, the penalty could nevertheless be properly assessed on the basis of respondent's raising the issue in his amendment to answer, pursuant to section 6214(a).[9]

In Legg v. Commissioner, 145 T.C. 344, 348-349 (2015), much as in the case before us, the parties disagreed as to whether section 6751(b) "must apply to the first notice that the IRS sends the taxpayer", as the taxpayers argued, or whether it "applies only before the assessment of penalties, not before the determination of penalties in a notice of deficiency", as the IRS argued. Concluding that the IRS would prevail in Legg even under the taxpayers' interpretation of the statute, we found it unnecessary to resolve this dispute about the "timing aspects" of section 6751(b). Id. at 349. We address that issue today for the first time.

For the reasons discussed below, we agree with respondent that any argument that the IRS has failed to satisfy the requirements of 6751(b) is

---

[9]The Commissioner routinely asserts sec. 6662(a) penalties in answers, and the Court has jurisdiction over them pursuant to sec. 6214(a). In the case of a motion to assert penalties in an amended answer, the Court considers whether granting leave for the amendment would prejudice the taxpayer. See Estate of Quick v. Commissioner, 110 T.C. 172, 180 (1998); Phillips v. Commissioner, T.C. Memo. 2013-215, at *3-*4. In the Court's October 6, 2014, order granting respondent's motion for leave to file amended answer, the Court stated that it saw "no possible prejudice" to petitioners.

premature. Consequently, we need not decide whether Mr. Mackey made, or was authorized to make, the "initial determination of * * * assessment" within the meaning of section 6751(b), whether the initial determination has been properly approved, or whether any error in this regard was harmless or was overcome by respondent's raising the 20% penalty in his amendment to answer.

We start, as we must, with the language of the statute. See Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 254 (2000) ("[A]s in any case of statutory construction, our analysis begins with the language of the statute[.] * * * And where the statutory language provides a clear answer, it ends there as well." (last alteration in original) (quoting Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999))). Section 6751(b) provides in relevant part:[10]

> SEC. 6751(b). Approval of Assessment.--
>
> (1) In general.--No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate.

---

[10]Sec. 6751(b)(2) provides for "Exceptions" that include "any other penalty automatically calculated through electronic means." The definition of a sec. 6662(b)(2) "substantial understatement of income tax" goes beyond mere calculation, see sec. 6662(d)(1)(A), and respondent does not contend that this exception applies, see also IRM pt. 20.1.5.1.6(8) (July 1, 2008).

This provision requires written approval of the "initial determination of * * * assessment" before a penalty can be assessed.[11]  Notably absent from section 6751(b), however, is any requirement that the written approval of the "initial determination of * * * assessment" occur at any particular time before the "assessment" is made.

An "assessment" is "the formal recording of a taxpayer's tax liability" on the IRS' records.[12]  Baltic v. Commissioner, 129 T.C. 178, 183 (2007); see also Hibbs v. Winn, 542 U.S. 88, 100 (2004) ("An assessment is made 'by recording the liability of the taxpayer in the office of the Secretary in accordance with rules

---

[11]Neither the Code nor the regulations define "initial determination of * * * assessment".  The term apparently appears nowhere else in the Code.  We find it unnecessary to define the term for purposes of our present analysis.

[12]The regulations provide:

> The district director and the director of the regional service center shall appoint one or more assessment officers.  * * * The assessment shall be made by an assessment officer signing the summary record of assessment.  The summary record, through supporting records, shall provide identification of the taxpayer, the character of the liability assessed, the taxable period, if applicable, and the amount of the assessment.  The amount of the assessment shall, in the case of tax shown on a return by the taxpayer, be the amount so shown, and in all other cases the amount of the assessment shall be the amount shown on the supporting list or record.  The date of the assessment is the date the summary record is signed by an assessment officer.  * * * [Sec. 301.6203-1, Proced. & Admin. Regs.]

or regulations prescribed by the Secretary'." (quoting section 6203)). Assessment of the 20% penalties at issue in this case cannot happen until our decision becomes final and unappealable. See secs. 6213(a), 6665(a), 7485. Consequently, under a plain reading of the statute, the issue petitioners seek to raise is not ripe for review and will not be ripe for review until the penalty of which they complain has been "assessed" in alleged violation of the supervisory-approval requirement.[13]

Petitioners take a different view, asserting on brief: "The plain language of section 6751(b) effectively provides that the written approval must be obtained by the time of the 'initial determination'". (Emphasis added.) Clearly, this is incorrect. Before it can be approved, an initial determination must first exist. Petitioners seem to suggest that an "initial determination" must embody some earlier, would-be determination that turns into a full-fledged "initial determination" only after gaining supervisory approval. But again, this cannot be right--the statute cannot reasonably be read to contemplate, as the subject of supervisory approval, a determination earlier than the "initial determination", without violating the meaning of "initial".

---

[13]Contrary to the dissent's suggestion, see dissenting op. p. 74, our conclusion is not based on the "fact that a rule [i.e., sec. 6751(b)(1)] is cast as a bar on 'assessment'" but rather on the fact that we cannot necessarily know, before the IRS assesses a penalty, whether the IRS will have failed to comply with the sec. 6751(b)(1) requirement.

Seeming to recognize that petitioners' statutory construction is unsustainable, the dissent advances a possibly more elastic but no less problematic construction, concluding that "[s]upervisory approval must accompany the penalty determination."[14]  See dissenting op. p. 80.  The only textual support in section 6751(b)(1) that the dissent finds for this statutory construction hinges on the word "making", as appears in the phrase "of the immediate supervisor of the individual making such determination."  The dissent argues in essence that by using the present participle "making", rather than some past-tense verb form, the statute means that the supervisor must act when "the individual [is] making such determination."  The dissent's grammatical analysis and conclusions do not withstand scrutiny, for the reasons spelled out in the margin.[15]  In any event,

_____

[14]The dissent cannot seem to settle on a single articulation of its position, for it also asserts:  "For a penalty determined in a notice of deficiency, the supervisory approval required by section 6751(b)(1) must be obtained before the Tax Court suit is filed."  See dissenting op. p. 77.  The seeming lack of fixity in the dissent's position highlights the problem of attempting to judicially legislate a deadline not found in the statute.

[15]As used in sec. 6751(b)(1), the participle "making" is a nonfinite verb form that is part of the reduced adjectival clause ("reduced" because it omits the relative pronoun "who" and any auxiliary verb) "making such determination".  Such a nonfinite verb form does not indicate when the action occurs; rather the time of the action must be inferred from the context.  See http://dictionary.cambridge.org/us/grammar/british-grammar/clauses-finite-and-non-finite (last visited Oct. 18, 2016); see also I George O. Curme, A Grammar of the

(continued...)

reading the one-sentence text of section 6751(b)(1) in its entirety reveals a larger problem with the dissent's analysis.

Section 6751(b)(1) provides that written approval of the initial determination of assessment should be made either by "the immediate supervisor

---

[15](...continued)
English Language 242 (1977) ("The present participle, infinitive, and gerund are not confined to reference to present time."); Sidney Greenbaum, The Oxford English Grammar 277 (1996) ("The time reference of the participle clause is inferred from the host clause"). In sec. 6751(b)(1), "making" functions without specific tense, much as it does in this statement: "We should respect the individual making such an argument". This statement obviously does not mean, as the dissent's analysis would suggest, that we should respect this type of individual only while such an argument is being made. Rather, in this example, as in the statute, "making" is part of a reduced adjectival clause modifying "individual"--it tells which "individual" without indicating when exactly the "making" occurred, occurs, or will occur.

Furthermore, in sec. 6751(b)(1) the "making" clause is itself part of a larger adjectival prepositional phrase, "of the individual making such determination" modifying "supervisor"--it tells which supervisor, without indicating when the supervisor's action of approving the initial determination occurs or will occur (although from the context we know that the supervisor's approval must follow the subordinate's determination, as explained in the text above). At most, the verb form "making" might suggest that the immediate supervisor giving the approval should be the same immediate supervisor who held that position at the time of the making of the initial determination, as opposed to someone who might have held that position at some other time. And although the dissent initially refers to "making" as an adjective, ultimately the dissent finds it necessary to assign it an adverbial function, paraphrasing the statute by using an adverbial "when" clause not found in the statute and then for good measure inserting into the statute an extra word, so as to state: "[T]he statute indicates that the supervisor must act when 'the individual [is] making such determination.'" See dissenting op. p. 80. But that is not what the statute says, and that is not what it means.

of the individual making such determination" or by "such higher level official as the Secretary may designate."[16] The "higher level official" phrase stands apart from the "making" phrase. Consequently, whatever implications might be thought to arise from the "making" phrase as relates to approval by immediate supervisors disappear as relates to approval by higher level officials. There is no sensible reason to read into the statute, on the basis of such subtle implication as might be found in the word "making", a contemporaneous approval requirement that would apply nonuniformly, if at all, to different types of reviewing officials.

In fact, the statute's provision for approval by a "higher level official" reinforces the conclusion that the statute imposes no deadline for the requisite approval before the date of assessment. Nothing in the statute requires the Secretary to make this designation at any particular time; it need occur only in time for the newly designated official to provide the requisite written approval before the assessment is made.[17] And in allowing for the possibility of written

---

[16]Presumably finding it inhospitable to its position, the dissent largely ignores--going so far as to elide from its quotation of the statute--the provision that permits the written approval to be given by a "higher level official". See dissenting op. p. 70.

[17]The parties do not point us to any designation of a "higher level official" that has been made to date. See IRM pt. 20.1.1.2.3(1) (Feb. 22, 2008) ("At this time, the Secretary has not designated any higher level official to approve initial

(continued...)

approval by officials to be designated by the Secretary at some indefinite time in the future, the statute clearly contemplates that the written approval is not required "by the time of the initial determination", as petitioners contend, or at any other particular time before the assessment is made.

Petitioners point to the IRS' current administrative practice, which apparently requires the supervisor's approval to be noted on the form reflecting the agent's assertion, see IRM part 20.1.5.1.6(4) (Jan. 24, 2012) (see IRM part 20.1.5.1.6(4) (July 1, 2008) for IRM provision in effect for 2008), or otherwise be "documented in the workpapers", IRM pt. 20.1.5.1.6(8) (Jan. 24, 2012) (no equivalent IRM provision found for 2008); see also IRM pt. 20.1.1.2.3(6) (Aug. 5, 2014) ("The managerial review and approval must be documented in writing and retained in the case file."); IRM pt. 20.1.1.2.3(7) ("[T]he IRS may wish to provide the taxpayer with a courtesy copy of the document showing that a manager approved the penalties[.]") (see IRM pt. 20.1.1.2.3(6) and (7) (Feb. 22, 2008) for IRM provisions in effect for 2008). We have no reason to question these

---

[17](...continued) determinations."). But the Secretary retains his authority to make such a designation at some point in the future. For purposes of our analysis, it is immaterial whether the Secretary has in fact exercised this authority. The relevant point is that Congress has created a statutory regime under which supervisory approval of penalty assessment could well occur a substantial period after the "initial determination" was made.

administrative procedures--certainly there is nothing in section 6751(b) to prevent the IRS from obtaining supervisory approval of penalties sooner rather than later. But IRM provisions do not have "the force or effect of law", Vallone v. Commissioner, 88 T.C. 794, 807 (1987), and do not create enforceable rights for taxpayers, see Fargo v. Commissioner, 447 F.3d 706, 713 (9th Cir. 2006), aff'g T.C. Memo. 2004-13. Consequently, these administrative procedures, although seemingly salutary, are immaterial to our conclusion that the statute imposes no particular deadline for the IRS to secure the required written approval before a penalty is assessed.

We find further textual support for this conclusion in the effective date of section 6751(b)(1). As enacted on July 22, 1998, the legislation respecting section 6751 provided: "The amendments made by this section shall apply to notices issued, and penalties assessed, after December 31, 2000."[18] IRS Restructuring and Reform Act of 1998, Pub. L. No. 105-206, sec. 3306, 112 Stat. at 744. The two components of this effective date provision ("notices issued" and "penalties

---

[18]The effective date was later extended to June 30, 2001. Consolidated Appropriations Act of 2001, Pub. L. No. 106-554, app'x G, sec. 302(b), 114 Stat. at 2763A-632. The legislative history indicates that the effective date was extended "due to the need for substantial systems modifications, and Year 2000 programming priorities". H.R. Conf. Rpt. No. 106-1004, at 354 (2000), 2000-3 C.B. 390, 420.

assessed") correspond to section 6751(a) (relating to the computation of penalty included in a "notice") and section 6751(b) (relating to approval of penalty "assessment"). The terms "notice" and "assessment" appear exclusively in subsections (a) and (b) respectively; consequently, we conclude that the statute made section 6751(a) effective for "notices issued" after December 31, 2000, while section 6751(b) was made effective for "penalties assessed" after December 31, 2000.[19]

---

[19]The dissent suggests that the effective-date phrase "notices issued, and penalties assessed" should apply without differentiation to both subsecs. (a) and (b) of sec. 6751, even though subsec. (a) deals only with notices and even though subsec. (b) deals only with assessments. See dissenting op. p. 81. In defense of this woodenly literal construction, the dissent speculates that Congress might have intended "notices issued" as the effective-date trigger for a penalty that is "subject to notice of deficiency procedures" and "penalties assessed" as the effective-date trigger for "assessable penalties". See id. p. 82. This analysis assumes that "notices" in the effective-date provision means "notices of deficiency", contrary to strong contextual evidence that this undefined term refers instead to "notice of penalty", as that term is used in subsec. (a). Moreover, the dissent seems to assume that an assessable penalty would never be the subject of a "notice". That is incorrect. See, e.g., sec. 6672(b) (requiring a preliminary "notice" for the assessable penalty for failure to collect and pay over tax); see also sec. 7522 (describing required content of any "notice" relating to, among other things, "assessable penalties"). In any event, nothing in the statutory effective-date provision supports the notion that "notices issued, and penalties assessed"--if that phrase were thought to apply indiscriminately to subsecs. (a) and (b) as the dissent contends--would apply discriminately to different types of penalties. Rather, the dissent's highly literal reading of the effective-date statutory provision would result, equally literally, in a binary effective date (the date of the notice of deficiency and the date of the assessment) for any penalty properly considered in a

(continued...)

As it relates to section 6751(b), the effective date provision ("penalties assessed" after the specified date), like the title of section 6751(b) ("Approval of Assessment"), clearly indicates that the statutory provision is focused on assessment rather than on some earlier event. The effective date also harmonizes with our construction of the statute--a penalty assessed after the effective date is subject to the requirement that written approval be in place as of the time of assessment, regardless of when the "initial determination of * * * assessment" might have occurred. Under our reading, then, the statute has entirely prospective application. Under petitioners' and the dissent's reading of the statute, by contrast, the IRS would have been required to procure the written approval by the time of the "initial determination", even if the "initial determination" occurred before the effective date--or even before the enactment--of section 6751(b).[20]

---

[19](...continued) deficiency case such as this. Apart from being illogical, such an effective date could give rise to internal inconsistency (for instance, in a situation where a notice of deficiency was issued before December 31, 2000, but the assessment was not made until after December 31, 2000).

[20]The dissent's unorthodox reading of the sec. 6751(b)(1) effective-date provision (discussed supra note 19) does not affect this conclusion since the dissent's view does not seem to exclude the possibility--in fact, might be thought to generally assume--that an "initial determination of * * * assessment" could precede any notice of deficiency.

Consequently, under petitioners' and the dissent's reading of the statute, the IRS could have been subject, retroactively, to a requirement to obtain written approval as of a time before the requirement had even come into existence. And even in the case of an initial determination made after the date of enactment of section 6751(b)(1) but before the effective date, the IRS would have had no way of knowing for sure whether a particular initial determination ultimately would or would not have been subject to the written approval requirement. That would have depended upon whether the assessment ultimately would occur, if at all, before or after the effective date (or under the dissent's view, whether a notice of deficiency would issue, if at all, before or after the effective date)--eventualities not necessarily knowable as of the time when, under petitioners' and the dissent's views, the written approval would have been required.

Under petitioners' and the dissent's reading of the statute, then, the IRS would have been effectively constrained to treat any "initial determination" after July 22, 1998, as being presumptively subject to the new requirements of section 6751(b)(1). But this would effectively transform the effective-date provision of section 6751(b)(1) from "penalties assessed after" to "initial determinations of

penalties assessed after". Suffice it to say, if Congress had intended to make section 6751(b)(1) effective in this manner, it would have known how to do so.[21]

Another anomalous result of petitioners' and the dissent's reading of the statute would be to render the six-month postponement of the effective date, as described supra note 18, without meaningful consequence or effect. It seems implausible that Congress would have intended the statute to operate in this manner; and for this additional reason we think that petitioners' and the dissent's reading of the statute, from which this implausible result follows, misses the mark.

The sparse legislative history of section 6751(b)(1) reinforces our conclusion that the provision is focused on assessment of penalties. "The provision * * * requires the specific approval of IRS management to assess all non-computer generated penalties unless excepted." S. Rept. No. 105-174, at 65 (1998), 1998-3 C.B. 537, 601 (emphasis added); see also H.R. Conf. Rept. No. 105-599, at 260-261 (1998), 1998-3 C.B. 747, 1014. The legislative history also indicates that enactment of section 6751(b)(1) stemmed from concerns that "penalties should only be imposed where appropriate and not as a bargaining

---

[21]For instance, a companion provision in the same act that added sec. 6751 required the IRS to implement an enhanced supervisory review process for liens, levies, and seizures. That provision was made effective generally for collection actions commenced after the date of enactment. IRS Restructuring and Reform Act of 1998, Pub. L. No. 105-206, sec. 3421, 112 Stat. at 758.

chip." S. Rept. No. 105-174, supra at 65, 1998-3 C.B. at 601. These stated

concerns would seem to be addressed by our redetermination in this case: As

discussed in detail below, we conclude that imposition of the 20% penalty against

petitioners is appropriate, a conclusion that strongly suggests that the penalty was

not in fact imposed as a bargaining chip. For the reasons previously discussed,

however, it is premature to decide what additional burden, if any, section

6751(b)(1) might impose upon the IRS in assessing the deficiency as redetermined

in our decision. Cf. sec. 6215(a) (providing that once the Tax Court's decision

becomes final, the redetermined deficiency "shall be assessed").[22]

Having concluded that the notice of deficiency complied with section

6751(a) and that petitioners' argument about section 6751(b)(1) is premature, we

turn to the merits of the 20% penalty as determined against petitioners.

III.    The 20% Accuracy-Related Penalty

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty

with respect "to any portion of an underpayment of tax required to be shown on a

---

[22]We do not foreclose the possibility that a taxpayer who believes that a penalty has been assessed in violation of sec. 6751(b)(1) might raise this issue in a postassessment collection due process (CDP) proceeding. See secs. 6320(c), 6330(c)(1) (requiring the Appeals officer in a CDP hearing to obtain verification that the requirements of any applicable law or administrative procedure have been met).

return" if that underpayment is due to negligence or a substantial understatement of income tax. An accuracy-related penalty does not apply to any portion of an underpayment of tax for which the taxpayer had reasonable cause and acted in good faith. See sec. 6664(c)(1). An understatement is reduced if the taxpayer had substantial authority for the treatment of the items at issue, see sec. 6662(d)(2)(B)(i), or adequately disclosed in the return the relevant facts affecting the item's tax treatment and had a reasonable basis for the claimed treatment, see sec. 6662(d)(2)(B)(ii).

Given respondent's concession of the 40% valuation misstatement penalty under section 6662(h) and our holding in Graev I, the remaining question is whether petitioners are liable for the 20% accuracy-related penalty with respect to the disallowed charitable contribution deductions. As discussed below, we conclude and hold that petitioners are liable for the 20% accuracy-related penalty for an underpayment due to a substantial understatement of income tax for each year.[23]

_____

[23]Because we sustain the sec. 6662(a) accuracy-related penalty on the ground of substantial understatement under sec. 6662(b)(2), we need not decide whether the penalty should also be sustained on the ground of negligence under sec. 6662(b)(1).

A.    Substantial Understatement

Section 6662(b)(2) imposes a 20% penalty on any underpayment attributable to any "substantial understatement of income tax."  An understatement is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return.  Sec. 6662(d)(1)(A).  Under section 7491(c) the Commissioner bears the burden of production with respect to the liability of an individual for any penalty.[24]  To satisfy this burden he must present sufficient evidence to show that it is appropriate to impose the penalty in the absence of available defenses.  See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

In the notice of deficiency, respondent determined deficiencies of $237,481 and $412,620 for 2004 and 2005, respectively.  In Graev I, 140 T.C. at 409-410, we upheld the disallowance of petitioners' charitable contribution deductions for the cash and facade easement given to NAT.  Because there is no disagreement that these amounts exceed 10% of the tax required to be shown on petitioners'

---

[24]Petitioners contend that respondent bears the burden of proof as to the penalties under the burden-shifting rules of sec. 7491(a).  We disagree.  Sec. 7491(c), rather than sec. 7491(a), applies to penalties.  See Higbee v. Commissioner, 116 T.C. 438, 447 n.6 (2001) ("Considering * * * [the] limiting language of sec. 6665(a)(2), the reference in sec. 7491(a) to tax liabilities imposed by subtitle A or B (whereas penalties are imposed by subtitle F), and the structure of sec. 7491 as a whole, we believe that Congress intended for sec. 7491(c) (and not sec. 7491(a)) to apply to penalties.").

2004 and 2005 returns, respectively, respondent has met his burden of production.[25]

The burden of proof is thus on petitioners to show that they are not liable for the penalty because of reasonable cause, substantial authority, or adequate disclosure grounded in a reasonable basis. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 447.

### 1.    Reasonable Cause and Good Faith

Petitioners argue that they are not liable for the 20% accuracy-related penalty because they had reasonable cause for claiming the charitable contribution deductions and they acted in good faith.

In general the accuracy-related penalty does not apply to any portion of an underpayment of tax if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith. Sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances.

---

[25]Petitioners and the dissent argue that to satisfy his burden of production respondent must show compliance with sec. 6751(b)(1). We reject this argument for essentially the same reasons we previously discussed in holding that petitioners' argument with respect to sec. 6751(b)(1) is premature.

Sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's effort to assess his or her proper tax liability. Id.

In determining whether a taxpayer reasonably relied on professional advice for this purpose, we apply a three-prong test which asks whether: (1) the adviser was a competent professional who had sufficient experience to justify the reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); Van der Lee v. Commissioner, T.C. Memo. 2011-234 (citing Neonatology's test and finding that the taxpayers "failed to provide * * * [their accountant] with all relevant information" necessary to accurately report their charitable contributions), aff'd, 501 F. App'x 30 (2d Cir. 2012); Curcio v. Commissioner, T.C. Memo. 2010-115 (citing Neonatology and finding that there was "no evidence that petitioners' accountants had any particular expertise in employee benefit plans or that petitioners thought their accountants had such expertise"), aff'd, 689 F.3d 217 (2d Cir. 2012). Reliance on professional advice may constitute reasonable cause and good faith, but "it must be established that the reliance was reasonable." Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd on another issue, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991).

Petitioners argue that they reasonably relied on their C.P.A., Mr. Lerman, to prepare their returns for the years at issue and that this reliance constitutes reasonable cause and good faith. Their argument fails for two reasons. First, there is no credible evidence in the record that petitioners provided Mr. Lerman either the side letter or the information contained in the side letter. Second, the record provides no credible evidence of Mr. Lerman's advice to petitioners with respect to the side letter's effect on their claimed cash and conservation easement deductions.[26] We discuss these conclusions in more detail below.

a.      Necessary and Accurate Information

Although preparation of a taxpayer's return by a C.P.A. does not provide absolute protection against substantial understatement or negligence penalties, in some circumstances a taxpayer's reliance on a competent and experienced accountant in the preparation of the taxpayer's return may constitute reasonable cause and good faith. To show good faith reliance, however, "the taxpayer must establish that the return preparer was supplied with all necessary information and the incorrect return was a result of the preparer's mistakes." Weis v.

_____

[26]Because we find that petitioners fail to meet the second and third prongs of the test set out in Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2001), we need not address whether Mr. Lerman was a competent professional who had sufficient experience to justify petitioners' reliance.

Commissioner, 94 T.C. 473, 487 (1990); see also Westbrook v. Commissioner, 68 F.3d 868, 881 (5th Cir. 1995), aff'g T.C. Memo. 1993-634; Enoch v. Commissioner, 57 T.C. 781, 802 (1972) ("The ultimate responsibility for a correct return lies with the taxpayer, who must at least furnish the necessary information to his agent who prepared the return.").

The parties stipulated that in connection with preparing the Graevs' 2004 Form 1040, Mr. Graev provided to Mr. Lerman:

(1)    a copy of the executed Conservation Deed of Easement;

(2)    an executed Form NYC RPT-Real Property Transfer Tax Return;

(3)    an executed Department of Environmental Protection Customer Registration Form for Water and Sewer Billing;

(4)    an executed Form TP-584, Combined Real Estate Transfer Tax Return;

(5)    an executed National Park Service Historic Preservation Certification Application;

(6)    a Residential Appraisal Report from Miller Samuel, Inc.; and

(7)    an executed Form 8283 evidencing the contributions, signed by the Trust and Miller Samuel, Inc.

Mr. Graev and Mr. Lerman also submitted declarations listing these documents as having been provided to Mr. Lerman. None of these lists mentions the side letter or its contents.

As the Court held in Graev I, the side letter made petitioners' contributions nondeductible conditional gifts--at the time of the contributions, the possibility that the deductions would be disallowed and, as a result, that NAT would return the contributions, was not "so remote as to be negligible" under sections 1.170A-1(e), 1.170A-7(a)(3), and 1.170A-14(g)(3), Income Tax Regs. Therefore, our decision as to whether petitioners provided Mr. Lerman with "all necessary information" depends upon petitioners' establishing that they provided to him the side letter or disclosed to him its contents. Petitioners have failed to do so.

Petitioners ask us to infer that the document was provided or the information was conveyed because the evidence indicates that Mr. Graev and Mr. Lerman often spoke by telephone or in person and because, as stated in his declaration, Mr. Lerman "would not have prepared Mr. Graev's 2004 and 2005 Forms 1040 if * * * [he] did not believe Mr. Graev was entitled to claim the charitable contribution deduction * * * for his facade easement donation to the Trust"; Mr. Lerman "reviewed the[se] documents * * * to ensure they were complete and that they satisfied the substantiation requirements for claiming the

charitable contribution deduction as * * * [he] understood them" and was "comfortable that * * * [he] had the documentation necessary to substantiate * * * [petitioners'] charitable deduction[s]".

We find petitioners' argument unpersuasive. The side letter was central to the Court's analysis and holding in Graev I, which was issued about 18 months before Mr. Lerman and Mr. Graev signed their declarations. If petitioners had provided the letter to Mr. Lerman, or if they had discussed its contents with him, it seems reasonable to assume that the declarations would have mentioned this fact and that other evidence in the record would corroborate it. But as previously mentioned, the declarations are silent on this point and there is no other evidence in the record of Mr. Lerman's considering or advising petitioners about the side letter. His declaration vaguely discusses his review of documents that were provided to him (the list does not include the side letter) and his opinion that they were sufficient to substantiate petitioners' claimed charitable contribution deductions. We do not infer from this statement, however, that Mr. Lerman was provided the side letter--after all, the side letter does not directly affect the substantiation of the deductions but rather implicates the question as to whether the deductions (even if properly substantiated) are defeated by the tax-treatment contingency. See generally Graev I, 140 T.C. 377.

The record contains evidence of Mr. Graev's discussing the side letter with various NAT personnel. On September 15, 2004, Mr. Graev sent NAT an email[27] asking about their "thoughts especially as it relates to the side letter". After he later communicated to NAT that he "underst[ood] the risk", NAT sent him a side letter agreeing to "refund your entire cash endowment contribution and join with you to immediately remove the facade conservation easement from the property's title." And on August 8, 2005--a few weeks before petitioners filed their 2004 income tax return--NAT sent Mr. Graev a letter offering to withdraw the side letter, "which according to our attorney should restore the deductibility of your cash contribution". Mr. Graev did not, of course, take NAT up on its offer to withdraw the side letter.[28]

There is no evidence that Mr. Lerman, upon whose advice petitioners allegedly relied, ever discussed with them the side letter, its potential impact on the deductibility of petitioners' contribution, or NAT's offer to withdraw the letter.

---

[27]This communication mentions Mr. Graev's "accountants" but does not mention their names or qualifications or indicate that he had shared the side letter with them or received any advice from them about the side letter.

[28]The record does not clearly indicate why NAT seemed to believe that the side letter endangered the deduction only for Mr. Graev's cash contribution. As discussed in Graev v. Commissioner (Graev I), 140 T.C. 377 (2013), the side letter led to our disallowing deductions for both the cash contribution and the easement contribution, for essentially the same reasons.

Petitioners have failed to establish that they shared with Mr. Lerman either the side letter or its contents. We conclude that petitioners have failed to show that they provided him necessary and accurate information. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 100. For this reason alone, petitioners have failed to show that they had reasonable cause for claiming the charitable deductions. But as discussed below, petitioners' position also fails for other reasons.

b.    Actual Reliance in Good Faith

Even if we were to assume (as we do not) that petitioners provided Mr. Lerman the side letter or shared its contents with him, petitioners nevertheless have failed to establish that they relied on Mr. Lerman's advice in good faith when they reported the charitable contribution deductions.[29]

The regulations define advice as "any communication * * * setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the

_____

[29]Petitioners also argue that they relied on the advice of Mr. Miller in good faith. Mr. Miller did not conduct the appraisal; he was the supervisor of Dina Miller, who did. We did not address in Graev I whether the valuation was correct, whether either Mr. or Ms. Miller was a "qualified appraiser", or whether the appraisal is a "qualified appraisal". Because respondent has conceded the sec. 6662(h) valuation misstatement penalty, neither the Millers' credentials nor the appraisal's valuation is relevant to our analysis. In any event, the appraisal does not allude to the side letter or its contents or their impact on the deductibility of the easement donation.

benefit of) the taxpayer and on which the taxpayer relies * * * with respect to the imposition of the section 6662 accuracy-related penalty." Sec. 1.6664-4(c)(2), Income Tax Regs. Although the regulations allow flexibility regarding the form advice may take, they set out detailed requirements for the content of advice that can give rise to reasonable cause. For example, reliable advice must be "based upon all pertinent facts and circumstances", it must take into account the taxpayer's purposes for its actions, and it cannot be based on unreasonable assumptions. Id. subpara. (1)(i) and (ii). The regulations contemplate advice that involves an explicit communication in some form. See United States v. Boyle, 469 U.S. 241, 251 (1985) (characterizing the requisite advice as being "substantive advice of an accountant or attorney"). An adviser's failure to raise an issue may leave in doubt whether the adviser even considered the issue, much less engaged in any analysis or reached a conclusion about it. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 100 ("The mere fact that a certified public accountant has prepared a tax return does not mean that he or she has opined on any or all of the items reported therein.").

Petitioners suggest that Mr. Lerman rendered advice as evidenced by his statement that he "informed Mr. Graev that * * * [facade conservation] donations were legitimate but were 'high visibility transactions' to the Internal Revenue

Service". Petitioners point to a September 15, 2004, email from Mr. Graev to NAT stating that his "accountants * * * have advised me to be very cautious" and asking NAT: "What are your thoughts especially as it relates to the side letter[?]". And Mr. Graev's declaration states that he "relied on Mr. Lerman's advice in determining the availability of the charitable contribution deduction".

Petitioners ask the Court to infer from these statements and circumstances that Mr. Graev discussed the side letter with Mr. Lerman; that Mr. Lerman's advice was a direct result of that conversation; and that Mr. Graev's email was referring to this advice.

We are unconvinced. When Mr. Graev sent his September 15, 2004, email to NAT, he had not yet submitted a facade conservation easement application to NAT--he did that on September 20, 2004. And because he had not yet submitted the application, he had not received his side letter--which he received on September 24, 2004. With respect to the effect of the side letter, it is difficult to see how petitioners could have reasonably relied on a single conversation between Messrs. Graev and Lerman before the side letter came into existence. And there is no evidence of any subsequent discussion of the side letter between Mr. Graev and Mr. Lerman.

After Mr. Graev granted the facade conservation easement on December 17, 2004, and before petitioners filed their 2004 Federal income tax return, NAT sent Mr. Graev at least three letters urging him to seek professional tax advice, in response to pending legislative developments and in the light of the concerns of NAT's own lawyers about the effect of the side letter. As previously noted, in its August 8, 2005, letter NAT went so far as to offer to withdraw the refund offer to "restore the deductibility of your cash contribution." The record does not establish that petitioners sought advice from Mr. Lerman in response to any of these communications.

Petitioners have failed to establish that they reasonably relied on Mr. Lerman's advice in claiming their cash and easement contribution deductions notwithstanding the side letter.

### c. Petitioners' Efforts

"[T]he most important factor" in determining whether taxpayers have reasonable cause for their tax treatment and whether they act in good faith "is the extent of the taxpayer[s'] effort to assess the taxpayer[s'] proper tax liability." Sec. 1.6664-4(b)(1), Income Tax Regs. We have found that petitioners' purported reliance on Mr. Lerman's advice does not meet the Neonatology requirements.

We thus look to the record to evaluate the adequacy of petitioners' efforts to assess their proper tax liabilities in other ways.

Although petitioners reported the charitable contributions on their 2004 and 2005 returns, they did not disclose the side letter or its contents. See Rolfs v. Commissioner, 135 T.C. 471, 496 (2010) (considering disclosure on tax returns as a factor to be considered in the reasonable cause and good faith test), aff'd, 668 F.3d 888 (7th Cir. 2012). They also attached to their tax returns the Miller Samuel appraisal and a Form 8283, but again these documents did not address the side letter.[30]

Mr. Graev is an experienced attorney who has worked for prestigious law firms.[31] Mr. Graev was encouraged several times to seek tax or legal counsel regarding the side letter. And it was he who insisted on the side letter. There is no

---

[30]As previously discussed, we find it unnecessary to decide whether Mr. or Ms. Miller was a "qualified appraiser" or whether this appraisal is a "qualified appraisal". Even if we were to decide both issues in the affirmative, the appraisal and Form 8283 would still be insufficient to show good faith and reasonable cause on account of the absence of credible evidence showing petitioners' efforts to determine the impact of the side letter on their charitable contribution deductions.

[31]The record is silent as to Mr. Graev's area of expertise, but petitioners do not assert that it involved tax law.

evidence that he sought advice in response to NAT's encouragement.[32]  Mr. Graev

states in his declaration that he "researched the tax consequences of side letters"

and that he was aware of and relied upon the Court's holding in O'Brien v.

Commissioner, 46 T.C. 583 (1966), General Counsel Memorandum 36410 (Sept.

11, 1975), and Private Letter Ruling 8247121 (Aug. 26, 1982).[33]  But as we stated

in Graev I, 140 T.C. at 398 (quoting 885 Inv. Co. v. Commissioner, 95 T.C. 156,

161 (1990)), "[t]he mere fact that he required the side letter is strong evidence that,

at the time of Mr. Graev's contribution, the risk that his corresponding deductions

might be disallowed could not be (and was not) 'ignored with reasonable safety in

undertaking a serious business transaction.'"  We cannot, therefore, find that he

acted in good faith to assess the impact of the side letter upon the charitable

contribution deductions.[34]

---

[32]The only advice in the record regarding the side letter was conveyed from NAT lawyers through NAT employees to Mr. Graev.  Reliance on this advice would be unreasonable.  See Gerdau MacSteel, Inc. v. Commissioner, 139 T.C. 67, 192-195 (2012) (finding that reliance on tax advice of an interested party was neither reasonable nor in good faith); Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98.

[33]We address the adequacy of these authorities and materials as "substantial authority" below.

[34]There is no evidence that Mrs. Graev participated in this process other than by signing the 2004 and 2005 Forms 1040.

Because petitioners have failed to establish that they reasonably relied on professional advice and because they have not otherwise shown that they acted in good faith to assess their proper tax liabilities, we reject their contention that they meet the reasonable cause and good faith exception under section 6664(c).

2.      Substantial Authority

Petitioners argue that they had substantial authority for claiming the charitable contribution deductions notwithstanding the existence of the side letter.

Only where the weight of the authorities supporting the treatment is substantial in relation to the weight of the authorities supporting contrary positions does substantial authority exist for particular tax treatment. See Curcio v. Commissioner, 689 F.3d at 224-225; Norgaard v. Commissioner, 939 F.2d 874, 880 (9th Cir. 1991), aff'g in part, rev'g in part on another ground T.C. Memo. 1989-390; sec. 1.6662-4(d)(3)(i), Income Tax Regs. The substantial authority standard is less stringent than the more-likely-than-not standard (met only when the likelihood of a position's being upheld is greater than 50%) but is more stringent than the reasonable basis standard. Sec. 1.6662-4(d)(2), Income Tax Regs.

"The standard of 'substantial authority' requires that, when the facts and authorities are analyzed with respect to the taxpayer[s'] case, the weight of the

authorities that support the taxpayer[s'] position should be substantial when compared with those supporting the contrary position." Schirmer v. Commissioner, 89 T.C. 277, 283 (1987). To determine whether substantial authority exists, all relevant authorities, including those pointing to a contrary result, are taken into account. Sec. 1.6662-4(d)(3)(i), Income Tax Regs. Examples of relevant authority include statutory and regulatory provisions, caselaw, legislative history, and administrative interpretations by the Commissioner. Id. subdiv. (iii).

A taxpayer may have substantial authority for a position that is unlikely to prevail, as long as the weight of the authorities in support of the taxpayer's position is substantial in relation to the weight of any contrary authorities. See id. subpara. (2). The regulations provide:

> The weight accorded an authority depends on its relevance and persuasiveness, and the type of document providing the authority. For example, a case or revenue ruling having some facts in common with the tax treatment at issue is not particularly relevant if the authority is materially distinguishable on its facts, or is otherwise inapplicable to the tax treatment at issue. * * *

Id. subpara. (3)(ii). The determination of whether a taxpayer's position has substantial authority is made as of the last day of the taxable year to which the return relates and at the time that return is filed. See id. subdiv. (iv)(C).

Petitioners argue that O'Brien v. Commissioner, 46 T.C. 583, General Counsel Memorandum 36410 (sometimes, the memorandum), and Private Letter Ruling 8247121 (sometimes, the letter ruling), provide substantial authority for their claimed charitable contribution deductions. We disagree.

In Graev I, 140 T.C. at 391-410, we considered at length the history of section 170 and the relevant regulations in construing the "so remote as to be negligible" standard found in sections 1.170A-1, 1.170A-7, and 1.170A-14, Income Tax Regs. We concluded that

> on the undisputed facts of this case, it is self-evident that the risk of IRS disallowance was not negligible. A substantial risk obviously arose from the IRS's then-announced intention to scrutinize charitable contribution deductions for facade easement contributions, and that risk is evident from Mr. Graev's insistence on NAT's issuing the side letter. We need not wonder how a donor or donee would have responded to this risk if he had foreseen it; we know how Mr. Graev did respond when he did foresee it: He did not "disregard" or "ignore[]" it, see 885 Inv. Co. v. Commissioner, 95 T.C. at 161; Briggs v. Commissioner, 72 T.C. at 657, but rather went out of his way to address it and hedge against it. [Graev I, 140 T.C. at 394-395; fn. ref. omitted; alteration in original.]

In Graev I, 140 T.C. at 401, this Court discussed O'Brien at length and distinguished it from the instant case, stating: "This case, unlike O'Brien, clearly presents the issue of whether the promised return of a charitable contribution upon the disallowance of the charitable contribution deduction can constitute a

subsequent event the possibility of which, if not negligible, renders the deduction not allowable. O'Brien sheds no light on that question." We concluded that "the Graevs' characterization of our ruling in O'Brien * * * [was] flatly incorrect". Id. at 398-399. Consistent with our analysis in Graev I, we conclude that O'Brien is not particularly relevant to the instant case and does not provide substantial authority for petitioners' position.[35] See sec. 1.6662-4(d)(3)(ii), Income Tax Regs.

In addition to this Court's Opinion in O'Brien, petitioners rely on General Counsel Memorandum 36410 and Private Letter Ruling 8247121.[36] Certain sources of authority become less relevant as time passes: "Any * * * [private letter ruling or general counsel memorandum] that is more than 10 years old

----

[35]In its analysis, in O'Brien v. Commissioner, 46 T.C. 583 (1966), the Court cited with approval Surface Combustion Corp. v. Commissioner, 9 T.C. 631 (1947), aff'd, 181 F.2d 444 (6th Cir. 1950), as involving a type of contingency similar to that in O'Brien but involving a different type of trust. Presumably for that reason, in their answering brief petitioners also cite Surface Combustion Corp. as substantial authority, though without any separate discussion. For reasons similar to those that lead us to conclude that O'Brien does not constitute substantial authority for petitioners' position, neither does Surface Combustion Corp.

[36]In Graev I we declined to consider the IRS private letter ruling in the light of sec. 6110(k)(3), which provides: "(3) Precedential status.--Unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent." The same impediment does not arise in the context of evaluating substantial authority. Sec. 1.6662-4(d)(3)(iii), Income Tax Regs., lists authority that can be relied upon and includes both private letter rulings and general counsel memoranda.

- 59 -

generally is accorded very little weight. However, the persuasiveness and relevance of a document, viewed in light of subsequent developments, should be taken into account along with the age of the document." Sec. 1.6662-4(d)(3)(ii), Income Tax Regs. The letter ruling was some 23 years old when petitioners filed their returns claiming the disputed charitable contribution deductions, and the memorandum was about 30 years old. As discussed below, these documents are not so persuasive or relevant as to overcome their age, and we accord them little weight.

General Counsel Memorandum 36410, insofar as it is relevant, reaches a conclusion and distinguishes O'Brien in a way that seems unhelpful to petitioners.[37] The memorandum addresses whether under section 664 of the Code of 1954 "a provision of a trust that provides the trust shall be deemed null and void and all of the trust assets returned to the grantors if the Internal Revenue Service disallows a deduction for the value of the remainder interest disqualif[ies]

---

[37]It appears that sec. 1.6662-4(d)(3)(iii), Income Tax Regs., excludes this memorandum from those which are able to be part of substantial authority, stating: "[T]he following are authority for purposes of determining whether there is substantial authority for the tax treatment of an item: * * * general counsel memoranda issued after March 12, 1981 (as well as general counsel memoranda published in pre-1955 volumes of the Cumulative Bulletin)". We need not decide whether the memorandum is excluded under this regulation because we conclude for other reasons that it does not constitute substantial authority for petitioners' position.

the trust as a charitable remainder annuity trust".  The memorandum distinguishes O'Brien because O'Brien was issued before the enactment of section 664 of the Internal Revenue Code of 1954 and because the provisions in question in O'Brien, "in effect, remove[d] the return of the contributions from the control of the taxpayer and insure[d] that the taxpayer w[ould] not be allowed a deduction for a contribution that subsequently may be returned to him and not given to charity." The memorandum concludes that "the trust does not qualify as a charitable remainder annuity trust under section 664 of the [Internal Revenue] Code and the contribution to the trust is not deductible as a charitable contribution for Federal income tax purposes."

Petitioners do not meaningfully explain why they believe this 30-year-old memorandum constitutes substantial authority for their claimed charitable contribution deductions, and we do not view it as such.

Finally, petitioners cite as substantial authority Private Letter Ruling 8247121.  It involves a conveyance of real estate to the U.S. Postal Service contingent upon the taxpayer's receiving a ruling from the IRS that the conveyance qualified as a charitable contribution deduction under section 170(c)(1).  If a ruling was not received by a specified date, then the Postal Service would reconvey the property to the taxpayer.  The letter ruling concluded that "a

contribution of real estate to the United States Postal Service will qualify for a charitable deduction under section 170(c)(1) of the Code as long as the gift is made for exclusively public purposes." It further summarily concluded that the contingency "d[id] not serve to invalidate the gift", citing O'Brien with no additional analysis of this issue.

Like O'Brien, the letter ruling does not address the "so remote as to be negligible" requirement of the section 170 regulations. As previously explained, and for the reasons discussed at length in Graev I, the Opinion in O'Brien does not constitute substantial authority for petitioners' position. And because the letter ruling relies almost entirely on O'Brien, we do not find it persuasive as to whether petitioners' tax-treatment contingency should defeat their deduction. Taking into account the letter ruling's lack of persuasiveness, its age (over 20 years old when petitioners filed the returns in question), and its nonprecedential status, we accord it little weight.

Petitioners point to no other authorities upon which they relied in claiming the disputed deductions. We conclude that the authorities that support petitioners' deductions for the cash and conservation easement contributions are not substantial when weighed against the contrary authorities. See sec. 1.6662-4(d)(3)(ii), Income Tax Regs. Contra Graev I, 140 T.C. at 381 n.4 (citing

numerous pre-2004 cases involving facade easements), 387-390 (examining the history of section 170 and section 1.170A-1(e), Income Tax Regs., and identical wording in section 81.46(a), Estate Tax Regs. (1949), along with its history and relevant caselaw), 391-393 (examining the wording of the statute and congressional intent), 393-409 (addressing at length the "so remote as to be negligible" standard found in sections 1.170A-1, 1.170A-7, and 1.170A-14, Income Tax Regs.).

### 3. Reasonable Basis and Adequate Disclosure

Petitioners argue in the alternative that any understatement should be reduced because they made adequate disclosure of the charitable contribution deductions and there was a reasonable basis for their tax treatment. See sec. 6662(d)(2)(B). Reasonable basis is a "relatively high standard" that is "not satisfied by a return position that is merely arguable or that is merely a colorable claim." Sec. 1.6662-3(b)(3), Income Tax Regs.

To satisfy the adequate disclosure standard of section 6662(d)(2)(B)(ii), taxpayers must disclose the relevant facts on a properly completed form attached to the return or to a qualified amended return. Sec. 1.6662-4(f)(1), Income Tax Regs. For a disclosure to be adequate, it "must be sufficiently detailed to alert the Commissioner and his agents as to the nature of the transaction so that the

decision as to whether to select the return for audit may be a reasonably informed one." Estate of Fry v. Commissioner, 88 T.C. 1020, 1023 (1987); see Schirmer v. Commissioner, 89 T.C. at 285-286 ("[A]dequate disclosure * * * can nonetheless be satisfied by providing on the return sufficient information to enable respondent to identify the potential controversy involved."). "The disclosure must be more substantial than providing a clue that would intrigue the likes of Sherlock Holmes but need not recite every underlying fact." Highwood Partners v. Commissioner, 133 T.C. 1, 21 (2009) (citing Quick Tr. v. Commissioner, 54 T.C. 1336, 1347 (1970), aff'd, 444 F.2d 90 (8th Cir. 1971)). Adequacy of disclosure is judged by a reasonable person standard. Id. at 21-22 ("[This standard] does not require the Commissioner to engage in a thorough examination of the return to ascertain whether there is omitted gross income. A misleading statement on a return is not sufficient to apprise the Commissioner of the nature and amount of an omitted item.").

Respondent asserts that petitioners failed to satisfy the adequate disclosure requirement because they did not disclose the side letter or its contents on their returns or on any other attached documents. We agree.

As discussed at length in Graev I, petitioners' side letter takes on critical importance in evaluating the propriety of their claimed charitable contribution

deductions. Although petitioners included information about their charitable contribution deductions on their 2004 and 2005 Federal income tax returns, those returns did not adequately disclose information that might have alerted the IRS to the potential controversy about the tax-treatment contingency that could defeat the deduction.

In suggesting that they made adequate disclosure, petitioners point to a provision of the deed of easement which states that "nothing herein contained shall be construed to limit * * * [NAT's] right to * * * abandon some or all of its rights hereunder." Petitioners suggest in their answering brief that the deed of easement was submitted with their returns but point us to nothing in the record to support this assertion; the deed of easement is not included with the copies of petitioners' returns that are included in the record as stipulated exhibits. In any event, even if we were to assume for the sake of argument that the deed of easement was submitted with petitioners' returns, we disagree that it constituted adequate disclosure of the relevant facts regarding the side letter. And absent disclosure of the letter or its contents, respondent was not adequately apprised of the potential controversy regarding the tax-treatment contingency. Furthermore, even if the disclosure were adequate, petitioners could not avail themselves of this defense because, as explained below, they have failed to provide authority that

could provide a reasonable basis for their return position.  See sec. 1.6662-3(c)(1), Income Tax Regs. (adequate disclosure has no effect where the return position lacks a reasonable basis).

Petitioners point to their interpretation of O'Brien in conjunction with General Counsel Memorandum 36410 and Private Letter Ruling 8247121 to show that they had a reasonable basis for their tax treatment.  However, as previously noted in Graev I, 140 T.C. at 398-399, the Court found that "the Graevs' characterization of our ruling in O'Brien is flatly incorrect, and [that] their reliance on it is therefore mistaken."  And as discussed above, we accord little weight to the decades-old memorandum and letter ruling.

Petitioners argue that they had a reasonable basis because Graev I involved an issue of first impression.[38]  We disagree.  Mr. Graev is an experienced attorney. He did not provide the side letter with either Form 1040, and he did not provide it to Mr. Lerman.  Clearly he was aware of the potential controversy relating to the side letter.  And it is equally clear that petitioners did not seek legal advice regarding that potential controversy.  As we stated in Graev I, 140 T.C at 394-395,

---

[38]Petitioners also raise this argument as a defense to the negligence penalty. As previously discussed, because we hold that petitioners are liable for the substantial understatement penalty, we do not consider whether the negligence penalty applies.

on the undisputed facts of this case, it is self-evident that the risk of IRS disallowance was not negligible.  A substantial risk obviously arose from the IRS's then-announced intention to scrutinize charitable contribution deductions for facade easement contributions, and that risk is evident from Mr. Graevs' insistence on NAT's issuing the side letter.  We need not wonder how a donor or donee would have responded to this risk if he had foreseen it; we know how Mr. Graev did respond when he did foresee it:  He did not "disregard" or "ignore[]" it, see 885 Inv. Co. v. Commissioner, 95 T.C. at 161; Briggs v. Commissioner, 72 T.C. at 657, but rather went out of his way to address it and hedge against it.

Petitioners' behavior in failing to seek counsel after NAT advised them to do so on several occasions was not reasonable.  At best, petitioners' return position was merely arguable or colorable and so does not satisfy the reasonable basis standard. See sec. 1.6662-3(b)(3), Income Tax Regs.

Because we find that petitioners neither adequately disclosed the terms of the side letter nor based their return position upon a reasonable claim, petitioners cannot rely on section 6662(d)(2)(B)(ii) as a defense to the 20% accuracy-related penalty.

Ultimately, we find unpersuasive all petitioners' arguments against imposing the section 6662(a) and (b)(2) substantial understatement penalty.  We sustain respondent's imposition of the 20% accuracy-related penalty on the basis of petitioners' substantial understatements of income tax on their 2004 and 2005

Federal income tax returns due to their disallowed cash and facade easement charitable contribution deductions.

To reflect the foregoing and the holding in <u>Graev I</u>,

<u>Decision will be entered under</u>

<u>Rule 155</u>.

Reviewed by the Court.

MARVEL, FOLEY, GALE, HOLMES, PARIS, KERRIGAN, LAUBER, and ASHFORD, <u>JJ</u>., agree with this opinion of the Court.

NEGA, J., concurring:  I reach the same result as the majority but for a different reason.  I would apply the reasoning in our Opinion John C. Hom & Assocs., Inc. v. Commissioner, 140 T. C. 210 (2013), and the Supreme Court cases guiding our analysis there, to find that the actions of respondent, even if not strictly complying with section 6751(b), did not prejudice petitioners.

I share the view that section 6751 was enacted to prevent IRS agents from using the prospect of penalties as either a threat or a bargaining chip against taxpayers.  Here, the examining agent and the Chief Counsel attorney each obtained supervisory approval for a higher penalty (40% rather than 20%).  Under the facts of this case, therefore, I do not believe one could conclude that the penalties were being used as a threat or a bargaining chip.

Deciding this case on the basis that petitioners were not prejudiced allows us to leave to another case the more detailed statutory analysis performed by both the majority and the dissent.  Our approach, like the majority opinion, also should not be construed as encouraging the IRS to retreat from its current administrative practices.  The failure of the IRS to follow the statute or its administrative practices may be challenged as an abuse of discretion in a collection action.  That case is not before us.

For these reasons, I decline to join with the majority but concur in the result.

GOEKE and PUGH, <u>JJ</u>., agree with this concurring opinion.

GUSTAFSON, <u>J</u>., dissenting:[1]  Section 6751(b)(1) provides:

> No penalty under this title shall be assessed unless the initial
> determination of such assessment is personally approved (in writing)
> by the immediate supervisor of the individual making such
> determination * * *.

In this case, however, the responsible revenue agent included a 20% accuracy-related penalty on the notice of deficiency without first obtaining the "approv[al] (in writing)" of his "immediate supervisor".  For that reason, I would not sustain this penalty.

I.      <u>The section 6751(b)(1) issue is not premature</u>.

Section 6671(b)(1) prohibits "assess[ment]" of a penalty in certain circumstances.  Since this case is a "deficiency case", which by definition is concluded <u>before</u> an assessment can be made, the IRS contends and the majority concludes that petitioners' argument that respondent failed to comply with section 6751(b)(1) is "premature" in this case.  <u>See</u> op. Ct. p. 4.  That conclusion ignores the nature of a deficiency case in the Tax Court.

---

[1]I do not disagree with the majority's treatment of section 6751<u>(a)</u> in part I. <u>See</u> op. Ct. pp. 22-24.  And apart from the logically prior issue of section 6751(b)(1), I do not disagree with its reasoning in part III about petitioners' liability for the penalty under section 6662(a).  <u>See</u> op. Ct. pp. 39-67.

A.     The Tax Court decides whether liabilities should be assessed.

Section 6201(a) authorizes the IRS to make "assessments" of tax liabilities. Sections 6201(a) and 6212(a) permit the IRS to determine a "deficiency" in a taxpayer's tax liability--i.e., a tax liability greater than what the taxpayer reported, see sec. 6211(a)--and in due course to "assess" that deficiency.  As the majority observes, see op. Ct. p. 28, an "assessment" is "the formal recording of a taxpayer's tax liability" on the IRS's records.[2]  The regulations provide how that recording is accomplished:

> The district director and the director of the regional service center shall appoint one or more assessment officers. * * * The assessment shall be made by an assessment officer signing the summary record of assessment. The summary record, through supporting records, shall provide identification of the taxpayer, the character of the liability assessed, the taxable period, if applicable, and the amount of the assessment. The amount of the assessment shall, in the case of tax shown on a return by the taxpayer, be the amount so shown, and in all other cases the amount of the assessment shall be the amount shown on the supporting list or record. The date of the assessment is the date the summary record is signed by an assessment officer. * * *[26 C.F.R. sec. 301.6203-1, Proced. & Admin. Regs.; emphasis added.]

---

[2]Baltic v. Commissioner, 129 T.C. 178, 183 (2007); see also Hibbs v. Winn, 542 U.S. 88, 100 (2004); ("The assessment shall be made by recording the liability of the taxpayer in the office of the Secretary in accordance with rules or regulations prescribed by the Secretary").

Thus, the assessment of a given liability (whether for tax or penalty) occurs when an "assessing officer" simultaneously makes tens of thousands of assessments in a single stroke.[3]

In the case of deficiencies, section 6213(a) interposes Tax Court proceedings between the IRS's determination of a deficiency and the IRS's assessment of that deficiency. That is, a taxpayer who receives the IRS's notice of deficiency has 90 days to petition the Tax Court for a "redetermination of the deficiency"; and if he does file such a petition, then "no assessment of a deficiency * * * shall be made * * * until the decision of the Tax Court has become final." Sec. 6213(a). Consequently, a Tax Court deficiency case (like the present case) necessarily occurs before any assessment of the deficiency could be made.

Since section 6751(b)(1) is a prohibition of assessment (in certain circumstances), then one could say (as the majority does, in effect) that section 6751(b) cannot be violated until a penalty has been assessed without

---

[3]As of the time of the Internal Revenue Service Restructuring and Reform Act of 1988 ("1998 Act"), Pub. L. No. 105-206, sec. 3301(a), 112 Stat. at 741, see infra p. 75, the assessments might number 100,000 per week in a given Internal Revenue Service Center. The summary record of assessment ("SRA") was signed by the assessment officer (and the assessments were thereby made) on each Monday, but "[t]he Monday assessment date * * * [was] prerecorded on each tax account included in the SRA before the SRA is signed." Tech. Adv. Mem. CC-TAM-PMTA-00207 (May 28, 1998).

supervisory approval. Therefore, the Commissioner and the majority reason, until the moment of assessment compliance with section 6751(b)(1) simply cannot be addressed. I disagree. Where a rule (such as section 6751(b)(1)) bars assessment, the Tax Court can and should hold that the liability cannot be assessed.

The IRS's notice of deficiency announces the agency's intention to <u>assess</u> a deficiency in tax.[4] If the recipient taxpayer files no Tax Court petition, then "the deficiency * * * shall be <u>assessed</u>". Sec. 6213(c) (emphasis added). If the recipient taxpayer does file a Tax Court petition, then the deficiency proceedings in the Tax Court effect a "restriction on <u>assessment</u>", sec. 6213(a) (emphasis added); and when those proceedings conclude, the redetermined deficiency "shall be <u>assessed</u>", sec. 6215 (emphasis added). That is, a deficiency determination is by definition oriented toward the proposed eventual <u>assessment</u> of the liability; and in deciding a deficiency case, the Tax Court is deciding whether a liability should be <u>assessed</u>. The Code explicitly confers on "the Tax Court jurisdiction * * * to determine whether" disputed liabilities "<u>should be assessed</u>".

---

[4]The form language of the notice of deficiency issued to petitioners reflects this dynamic: "We have <u>determined</u> that you owe additional tax or other amounts, or both, for the tax year(s) identified above. * * * The enclosed statement shows how we figured the deficiency. * * * If you decide not to sign and return the waiver, and you do not file a petition with the Tax Court within the time limit, <u>the law requires us to assess</u> and bill you for the deficiency after 90 days from the date of this letter". (Emphasis added.)

Sec. 6214(a) (emphasis added) (concerning liabilities greater in amount than those on the notice of deficiency).

The fact that a rule is cast as a bar on "assessment" does not at all preclude pre-assessment consideration of compliance with that rule. The preeminent instance of this truism is the statute of limitation, section 6501, which is a bar on untimely assessment. If the IRS issues a notice of deficiency that the taxpayer contends is untimely under section 6501, the taxpayer can challenge that notice in a deficiency case on the grounds that assessment of the proposed deficiency is barred by the statute of limitations. The Tax Court does not treat such challenges as premature in a pre-assessment deficiency case. Rather, if the taxpayer is correct that assessment is barred, then the Tax Court enters decision in favor of the taxpayer--in the pre-assessment context. See sec. 7459(e). If a taxpayer argues that assessment of a liability is barred by a statute--whether section 6501(a) or section 6751(b)--then the Tax Court can entertain that challenge in a deficiency case. The Tax Court's deficiency case procedures all relate to a proposed eventual assessment of tax; and the truism that any resulting assessment will not be recorded until after the Tax Court's processes are complete hardly renders "assessment" issues premature in a deficiency case.

B.    <u>Section 7491(c) brings supervisory approval of penalties into a deficiency case.</u>

Section 7491(c), enacted in the IRS Restructuring and Reform Act of 1998

("1998 Act"), Pub. L. No. 105-206, sec. 3301(a), 112 Stat. at 741, along with

section 6751(b), <u>id.</u> sec. 3306, 112 Stat. at 744, provides very broadly:

> Notwithstanding any other provision of this title, the Secretary shall have the burden of production in <u>any court proceeding</u> with respect to the liability of <u>any individual</u> for <u>any penalty</u> * * *.  [Emphasis added.]

By its terms, section 7491(c) thus applies "in any court proceeding".  Our

explanation of section 7491(c) in <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446-447

(2001), states:

> Congress' intent as to the meaning of the burden of production is evident from the legislative history. The legislative history of section 7491(c) sets forth:

>> in any court proceeding, the Secretary must initially come forward with evidence that it is appropriate to apply a particular penalty to the taxpayer before the court can impose the penalty.  This provision is not intended to require the Secretary to introduce evidence of elements such as reasonable cause or substantial authority.  Rather, the Secretary must come forward initially with evidence regarding the appropriateness of applying a particular penalty to the taxpayer; if the taxpayer believes that, because of reasonable cause, substantial authority, or a similar provision, it is inappropriate to impose the penalty, it is the taxpayer's responsibility (and not the Secretary's obligation) to raise those issues.  [H. Conf. Rept. 105-599, supra at 241, 1998-3 C.B. at 995.]

> Therefore, with regard to section 7491(c), we conclude that for the Commissioner to meet his burden of production, the Commissioner must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty.

It could hardly be "appropriate" for "the court [to] impose the penalty" if a statute declares that "No penalty * * * shall be assessed", as section 6751(b) does. This seems obvious if we hypothesize an instance of clear penalty abuse by a revenue agent. Suppose that, in the context of an audit, the agent cynically raises an unwarranted penalty as a bargaining chip, that he includes the penalty in a notice of deficiency without supervisory approval, and that the taxpayer challenges the notice by filing a petition in the Tax Court. Where the Commissioner is unable to show compliance with section 6751(b)(1), he is unable (in the words of the Conference Report) to "come forward with evidence that it is appropriate to apply a particular penalty to the taxpayer". Under the terms of section 6751(b)(1), "No penalty * * * shall be assessed".

I would therefore hold that compliance with section 6751(b) is properly a part of the burden-of-production inquiry in our deficiency cases involving penalties. Even if that were not the case, and if a showing of supervisory approval were not part of the Commissioner's initial burden, non-compliance with section 6751(b)(1) can surely be introduced by the taxpayer. As quoted above, the

legislative history makes it clear that once the IRS has met its burden of production on a penalty, "if the taxpayer believes that, because of reasonable cause, substantial authority, or a similar provision, it is inappropriate to impose the penalty, it is the taxpayer's responsibility (and not the Secretary's obligation) to raise those issues." It would be strange indeed if the taxpayer would be allowed to demonstrate "reasonable cause" but would be barred from showing that "No penalty * * * shall be assessed" under section 6751(b)(1). Where the taxpayer is able, if permitted, to demonstrate that "No penalty * * * shall be assessed", then the Tax Court cannot preclude the section 6751(b) defense and "impose the penalty".

In light of section 7491(c), consideration of section 6751(b)(1) is not at all "premature" in a deficiency case.

C. <u>For a penalty determined in a notice of deficiency, the supervisory approval required by section 6751(b)(1) must be obtained before the Tax Court suit is filed</u>.

The majority's holding that the section 6751(b)(1) compliance issue is premature in this deficiency case is buttressed by its conclusion that "the statute clearly contemplates that the written approval is not required * * * at any * * * particular time before the assessment is made." <u>See</u> op. Ct. p. 33. This conclusion is unwarranted.

1.      <u>Supervisory approval must be obtained when the supervisor has authority to grant approval</u>.

The statute can be construed only to require supervisory approval at a time when the supervisor has the ability to approve or disapprove the penalty--and no later.  Although section 6751(b)(1) itself does not provide when an examination supervisor loses authority to approve or disapprove a penalty proposed for inclusion in a notice of deficiency, elsewhere the Code does:  Section  6215(a) provides that "the <u>entire amount</u> redetermined as the deficiency by the decision of the Tax Court which has become final <u>shall be assessed</u>".[5]  (Emphasis added.) Thus, we know that, with respect to Mr. and Mrs. Graev's penalty liability (and to that of all taxpayers who file petitions in the Tax Court), supervisory approval must be obtained before the Tax Court's decision becomes final, because thereafter assessment of the penalty becomes mandatory on the IRS.  Supervisory approval or disapproval would thereafter be meaningless.

[5]To the same ultimate effect, section 6512(a) flatly provides (with exceptions not helpful here) that if the IRS issues a notice of deficiency and the taxpayer files a timely Tax Court petition, then "no credit or refund of income tax for the same taxable year * * * in respect of which the Secretary has determined the deficiency shall be allowed or made and no suit by the taxpayer for the recovery of any part of the tax shall be instituted in any court".  (For purposes of section 6512(a), a "refund of tax" includes penalties.  Sec. 6665(a)(2); <u>Cheesecake Factory Inc. v. United States</u>, 111 Fed. Cl. 686, 696 (2013).)  Consequently, the last moment that an IRS examination supervisor had any discretion as to Mr. and Mrs. Graev's penalty was before they filed suit.

And, of course, the supervisor lacks that authority not only when the Tax Court's decision has become final but much earlier--when the Tax Court petition is first filed. Pursuant to section 7803(b)(2)(D), it is not examination personnel but rather the Office of Chief Counsel that "represent[s] the Commissioner in cases before the Tax Court". After a case is pending, examination personnel might or might not be able to persuade Chief Counsel to concede a penalty, but the decision or determination whether to do so would not belong to an examination supervisor.

An examination supervisor has authority to approve a penalty determination only when the case is under the authority of the IRS's examination function.

> 2. The statute requires supervisory approval of the "initial determination".

Section 6751(b)(1) requires supervisory approval of "the initial determination of such assessment". We observed in Legg v. Commissioner, 145 T.C. 344, 349 (2015), that "[t]he dictionary defines 'initial' as 'having to do with, indicating, or occurring at the beginning'. Webster's New World College Dictionary 735 (4th ed. 2010)." The majority's interpretation, however, would permit compliance when the IRS was making its final determination of the assessment, not when the "initial determination" is being made.

3.     <u>Supervisory approval must accompany the penalty determination</u>.

The language of the statute does <u>not</u> require approval by the "supervisor of the individual <u>who made</u> such determination" or by the "supervisor of the individual <u>responsible for</u> such determination". The majority's opinion would arguably be consistent with either of those hypothetical statutes. But the actual statute says otherwise. Employing a present participle as an adjective, it provides:

> No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual <u>making</u> such determination * * *. [Sec. 6751(b)(1); emphasis added.]

Today we could say that Revenue Agent Feld is the individual <u>who made</u> the determination, or that he is the individual who <u>was responsible</u> for the determination. But we would not say that he is the individual "<u>making</u> such determination". That making occurred at a specific time in the past.

By requiring written approval by the supervisor of the individual "making" the determination, the statute indicates that the supervisor must act when "the individual [is] making such determination." Thus, supervisory approval must accompany the "initial determination".

D.    The effective date of the statute does not support the majority's interpretation.

As originally enacted in July 1998, section 6751 provided that it would become effective 17 months later "for notices issued, and penalties assessed, after December 31, 2000" (later extended to June 30, 2001).  The majority opines, see op. Ct. pp. 34-37, that the effective date of section 6751(b) is governed solely by the "penalties assessed" term (and that section 6751(a) is governed by "notices issued") and that therefore the effective date provision shows that Congress intended that the written approval be in place as of the time of assessment, regardless of when the initial determination might have been made.  "Under petitioners' * * * reading of the statute, by contrast, the IRS would have been required to procure the written approval by the time of the 'initial determination', even if the 'initial determination' occurred before the effective date--or even before the enactment--of section 6751(b)." See op. Ct. p. 36.

The symmetry of the majority's construction of the effective date statute ("notices" for subsection (a), "assessments" for subsection (b)), however esthetically pleasing it might be, does not appear in what Congress actually provided.  The statute as written provides for both subsections of section 6751 that the rules apply to "notices issued" after June 2001. The evident reason for adding

"and penalties assessed" is that, unlike income and estate taxes, some penalties--

the "assessable penalties" of sections 6671 through 6725--are not subject to

deficiency notice procedures.[6]  I understand the effective date provision for

section 6751 to apply to a penalty that is subject to notice of deficiency procedures

if the notice was issued after the effective date and to apply to assessable penalties

if they are assessed after the effective date.  If, as the majority supposes, Congress

had wanted to assign different effective dates to subsections (a) and (b), it knew

how to do so.[7]

---

[6]Section 6212 (entitled "Notice of Deficiency") applies to "any tax imposed by subtitles A [income taxes] or B [estate and gift taxes] or chapter 41, 42, 43, or 44 [certain excise taxes in subtitle D]".  The "assessable penalties" in subtitle F, chapter 68, subchapter B (secs. 6671-6725), are not determined in a notice of deficiency.  The accuracy-related penalty of section 6662 at issue here, however, is subject to deficiency procedures, pursuant to section 6665(a).  See United States v. Erie Forge Co., 191 F.2d 627, 630-631 (3d Cir. 1951), quoted in Winter v. Commissioner, 135 T.C. 238, 273 (2010).

[7]See, e.g., 1998 Act sec. 4401, 112 Stat. at 784, which amended Code section 8021 with the following effective dates:

(b)  Effective Dates.--

(1)  Subsection (e) of section 8021 of the Internal Revenue Code of 1986, as added by subsection (a) of this section, shall apply to requests made after the date of the enactment of this Act.

(2)  Subsection (f ) of such section shall take effect on the date of the enactment of this Act.

I conclude that for a penalty determined in a notice of deficiency issued after June 2001, supervisory approval is required, and that if a penalty is not subject to deficiency procedures, then supervisory approval is required before any assessment after June 2001. Nothing in this regime suggests that supervisory approval under section 6751(b)(1) can be postponed until the moment of assessment.

II.    The majority's interpretation would fail utterly to accomplish the purpose of the statute.

As is discussed above in part I.C, the majority concludes, see op. Ct. p. 33: "[T]he statute clearly contemplates that the written approval is not required * * * at any * * * particular time before the assessment is made." If that were true, then supervisory approval might be obtained after the Tax Court's deficiency case had been litigated and before the assessment had occurred; and in this case, it would still remain to be seen whether the IRS might yet obtain the necessary supervisory approval, so that we could not decide in favor of the taxpayer and invalidate the penalty determination on this basis. I explained above how the Code does not permit this construction, and I note here a further and fundamental problem with the majority's approach: It ignores the legislative purpose of section 6751(b)(1).[8]

---

[8]In Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of
(continued...)

If a statute is ambiguous, then we properly consult the legislative history to discern the statute's purpose.[9] The phrase "initial <u>determination</u> of such <u>assessment</u>" in section 6751(b) (emphasis added) is ambiguous because, in tax parlance, one does not "determine" an "assessment".[10] As we have noted, <u>see</u> <u>supra</u> part I.A, "assessment" is a term of art with a well-understood meaning--"the formal recording of a taxpayer's tax liability" on the IRS's records. Simply stated, an assessment is an administrative act. If we were to import that meaning into section 6751(b), the phrase "initial determination of such assessment" would be

_____

[8](...continued)
Legal Texts 63 (2012), Justice Scalia and Professor Garner include as Number 4, among 57 canons of construction (called "Sound Principles of Interpretation"), the "Presumption Against Ineffectiveness": "A textually permissible interpretation that furthers rather than obstructs the * * * [statute's] purpose should be favored."

[9]<u>See</u> <u>Caltex Oil Venture v. Commissioner</u>, 138 T.C. 18, 34 (2012) ("It is well settled that where a statute is ambiguous, we may look to legislative history to ascertain its meaning" (citing <u>Burlington N.R.R. v. Okla. Tax Comm'n</u>, 481 U.S. 454, 461 (1987))); <u>see also</u> <u>Palahnuk v. Commissioner</u>, 544 F.3d 471, 474 (2d Cir. 2008) ("Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting legislature's understanding of otherwise ambiguous terms"), <u>aff'g</u> 127 T.C. 118 (2006).

[10]In conventional tax parlance, one would usually speak of "determining" (or "redetermining") a "deficiency", <u>see</u> secs. 6212(a), 6213(a), or perhaps "determining" a "liability", <u>see</u> secs. 1552(a)(3), 3509; and one would usually speak of "making" an "assessment", <u>see</u> sec. 6203, or perhaps "verifying" it under section 6330(c)(1).

unworkable:  One can determine <u>whether to make</u> an assessment, but one cannot "determine" an "assessment".

Because the statute is thus ambiguous, we may look to the legislative history to determine Congress's intent. Through its Conference Report, Congress made its intent clear:  "The Committee believes that penalties should only be imposed where appropriate and not as a bargaining chip."  S. Rept. No. 105-174, at 65 (1998), 1998-3 C.B. 537, 601.  Taxpayers had complained to Congress that, in disputes about income tax liability, IRS agents sometimes unreasonably asserted penalty liability on top of the tax liability in order to create a bargaining chip for use in settlement negotiations with taxpayers.[11]  As we explained in <u>Legg v. Commissioner</u>, 145 T.C. at 348 (<u>citing</u> S. Rept. No. 105-174, <u>supra</u> at 65, 1998-3 C.B. at 601), Congress addressed this abuse in 1998 by enacting section 6751(b)(1), which provides:

> No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination * * *.

---

[11]Stefan Tucker, then chair-elect of the Section of Taxation of the American Bar Association, stated to Congress:  "[T]he IRS will often say, if you don't settle, we are going to assert the penalties.  If you do settle, we may not assert the penalties."  IRS Restructuring:  Hearings on H.R. 2676 Before the S. Comm. on Finance, 105th Cong. 529 (1998).

Thus, the statute created a supervisory approval requirement and invalidates the subordinate's penalty determination if he fails to get that approval.

The majority's construction of the statute, however, would permit the examining agent to make an unapproved initial determination of the penalty, possibly to be followed (still without approval) by further administrative and even judicial proceedings, with the approval finally to be obtained only when all that is left is the ministerial act, see supra note 3, of recording the assessment on the IRS's accounts.[12] This construction is implausible in the extreme--especially in an instance in which a penalty assertion becomes the subject of Tax Court litigation. Once Chief Counsel had argued and the Tax Court had held that the taxpayer is liable for an assessment, the supervisor's Johnny-come-lately approval of the "initial determination" would add nothing to the process. And where the Tax

---

[12]The instructions given to IRS personnel in the Internal Revenue Manual ("IRM") do not reflect this construction that would permit long-delayed supervisory approval. Rather, the supervisor's approval must be noted on the form reflecting the agent's determination, see IRM pt. 20.1.5.1.6(4) (Jan. 24, 2012) (see IRM pt. 20.1.5.1.6(4) (July 1, 2008) for IRM provision in effect in 2008), or otherwise be "documented in the workpapers", id. pt. 20.1.5.1.6(8) (Jan. 24, 2012) (no equivalent IRM provision found in 2008); see also id. pt. 20.1.1.2.3(6) (Aug. 5, 2014) ("The managerial review and approval must be documented in writing and retained in the case file"); id. pt. 20.1.1.2.3(7) ("The IRS may wish to provide the taxpayer with a courtesy copy of the document showing that a manager approved the penalties") (see IRM pt. 20.1.1.2.3(6) and (7) (Feb. 22, 2008) for IRM provisions in effect in 2008).

Court had held the taxpayer <u>not</u> liable for the penalty, the supervisor's consideration of the matter would then be completely moot. In either circumstance, the statute would have accomplished literally nothing toward the congressional goal expressed in the legislative history.

III.    <u>The IRS's other arguments are not valid</u>.

The majority concludes that the section 6751(b)(1) issue is premature and that therefore the Court need not decide the IRS's other three arguments. <u>See</u> op. Ct. pp. 26-27. Because I believe the section 6751(b)(1) issue is timely, I would address the other arguments as follows.

A.    <u>The revenue agent, not the Chief Counsel attorney, made the "initial determination"</u>.

1.    <u>Three administrative acts</u>

There are three administrative acts related to the 20% penalty as to which we might identify a determining "individual" and a supervisor:

(1)    the preparation of the Chief Counsel memorandum dated September 12, 2008, advising the 20% penalty as an alternative. The individual who drafted this advice was Attorney Mackey after his review of the proposed notice of deficiency, and it was initialed and thereby approved by his supervisor Mr. Baxer;

(2)     the preparation by Revenue Agent Feld of the revised notice of deficiency determining both the 40% penalty (as in the prior draft) and the 20% penalty (as Chief Counsel had advised).  It is stipulated that this revised notice was prepared without the written approval of the supervisor, Mr. Post; and

(3)     the drafting of the amendment to answer in this case in October 2014, affirmatively pleading the alternative 20% penalty.  The individual who drafted this amendment to answer was Chief Counsel Attorney Early, and her supervisor Ms. Branche initialed and approved a copy of the pleading.

Thus, two of these acts (i.e., (1) and (3)) were made by an individual (a Chief Counsel attorney) and were approved by the supervisor--and the IRS contends that one of these was the "initial determination of such [20% penalty] assessment" and that section 6751(b)(1) was thereby satisfied.  But one of these acts (i.e., (2)) was not approved by the supervisor; and this was in fact the "initial determination", so that section 6751(b)(1) was not satisfied.

### 2.     The September 2008 Chief Counsel memorandum

The Commissioner's principal contention is that Chief Counsel's September 2008 memorandum (and its approval) fulfilled the requirements of section 6751(b)(1).  The Commissioner contends that the relevant "individual" was Chief Counsel Attorney Mackey, because it was he who first advised that Mr.

and Mrs. Graev should, in the alternative, be held liable for the 20% penalty. He did so when he reviewed the draft notice of deficiency and advised the addition of the 20% penalty as an alternative to the 40% penalty already in the draft notice, and in so doing (the Commissioner contends), he thus made the "initial determination". Mr. Mackey's "immediate supervisor" was Mr. Baxer; and by initialing Mr. Mackey's memorandum, Mr. Baxer approved in writing the advice as to the 20% penalty. Thus, the Commissioner contends, the requirement of section 6751(b)(1) was satisfied in September 2008 by Chief Counsel personnel.

### a. Effect of a previous determination of non-liability

Against this contention, the Graevs argue that Agent Feld's previous non-inclusion of the 20% section 6662(a) penalty on his draft notice of deficiency and on the penalty approval form, either as a primary or alternative position, shows by negative implication that Agent Feld initially determined that the 20% penalty did not apply. They argue that any subsequent determination (by a Chief Counsel attorney or anyone else) could therefore never be a qualifying "initial determination". Under this position, the Commissioner would be forever limited to asserting only those penalties that are asserted on the first draft of the notice of deficiency (and on the agent's penalty approval form), and therefore the

Commissioner would be precluded from asserting any additional penalties in a notice of deficiency or through an answer or amended pleading in litigation.

This argument has no support in the text of the statute and is rebutted by attention to the statutory phrase "of such assessment". What section 6751(b) requires is supervisory approval of the "initial determination <u>of such assessment</u>" (emphasis added), i.e., approval of the first determination to assert that a penalty should be assessed. The statute makes no requirement whatsoever of obtaining approval for an IRS agent's determination that a penalty should <u>not</u> be assessed. There is no indication that Congress thought taxpayers need protection from favorable determinations <u>not</u> to assert penalties, and the statute makes no provision for that circumstance. Rather, section 6751(b) kicks in the <u>first</u> time (i.e., the "initial" time) that someone acting for the IRS makes a "determination" that a penalty <u>should</u> be assessed (i.e., a "determination of such assessment"). An implicit determination that a penalty should <u>not</u> be asserted does not affect the application of section 6751(b)(1) to a subsequent "initial determination" that a penalty <u>should</u> be asserted.

            b.      <u>Chief Counsel attorney advice as a "determination"</u>

However, the Graevs further contend that the Chief Counsel attorney's September 2008 memorandum advising the 20% penalty did not constitute an

"initial determination" for purposes of section 6751(b)(1).[13]  In fact, the Graevs

contend broadly that a Chief Counsel attorney can never make an "initial

determination" of a penalty for purposes of section 6751(b) because the initial

determination can be made only by the Commissioner or his employee.

I disagree with this broad contention; and I note that the statute makes no

requirement that the "initial determination" be made by an employee of the IRS,

rather than an attorney under the Chief Counsel.  Instead, the statute simply refers

to "the individual making such determination".  Sec. 6751(b)(1) (emphasis added).

However, I do conclude that a Chief Counsel attorney giving advice to

---

[13]I would not construe the parties' stipulation to reflect a supposed
concession of this issue by petitioners--nor does the Commissioner argue that we
should.  The stipulation does say that the 20% penalties "were initially determined
by Chief Counsel Attorney Gerard Mackey", see "Second Supplemental
Stipulation of Facts", para. 102 (Jan. 15, 2015); but the stipulation itself explains
(at para. 118, emphasis added) that "[p]etitioners' position is that the 'initial
determination' to assert the section 6662(a) penalties pursuant to section 6212 was
not approved in writing by the immediate supervisor of the individual making the
actual initial determination".  This explanation of petitioners' position is borne out
in "Petitioners' Opening Brief" (Apr. 1, 2015), which includes (at 40) a section
with the caption "RA Feld Made the Initial Determination"; and the Commissioner
does not object that this contention contradicts the stipulation.  (Similarly,
petitioners' answering brief filed May 15, 2015, repeatedly refers to Chief Counsel
Attorney Mackey's purported initial determination as "invalid".)  The actual facts
about the administrative acts made, papers signed, and approvals obtained are not
in dispute; and the question of which of these administrative acts was the "initial
determination" is a question of law.  I would therefore not treat the "initial
determination" issue as having been stipulated.

examination personnel about an examination-related matter does not make a "determination",[14] but rather gives advice to examination personnel who then make the determination. I so conclude for the following reasons.

As the IRS has organized its functions, an audit or "examination" of a tax return is the task of examination personnel. See 26 C.F.R. sec. 601.105(b)(1), Statement of Procedural Rules ("The original examination of income * * * returns is a primary function of examiners in the Examination Division of the office of each district director of internal revenue"). And with respect to the penalties in particular, "[t]he determination whether to assert penalties, identify the appropriate penalties, and calculate the penalty amount accurately is primarily the examiner's responsibility." IRM pt. 4.10.6.1.1 (May 14, 1999).[15] When examination

---

[14]Section 7805(a) empowers the Secretary to issue regulations to enforce this statute; and section 6751(b)(1) itself authorizes the Secretary to "designate[]" a "higher level official" to approve an initial determination. In addition, the Commissioner has the power to delegate authority within the IRS. See secs. 7701(a)(12)(A)(i), 7803(a)(2), 7804(a). I state no view as to whether a Chief Counsel attorney's advice might, under such regulations, designations, or delegations, be treated for purposes of section 6751(b) as an "initial determination" in the examination process or as an approval of such a determination.

[15]See also IRM pts. 20.1.1.2.3, 20.1.5.1.6 (requiring managerial approval for penalties determined by examination personnel). To this same effect, Mr. and Mrs. Graev also cite two (non-precedential) Chief Counsel documents: (1) Chief Counsel Memorandum No. 20125201F (Dec. 28, 2012), a 27-page memorandum

(continued...)

personnel determine that there is a deficiency of tax or a penalty that is owing, that determination may result in the issuance of a notice of deficiency. Section 6212(a) authorizes "the Secretary" to issue a notice of deficiency; but "[t]he term 'Secretary' means the Secretary of the Treasury or his delegate", sec. 7701(a)(11)(B) (emphasis added); and by Delegation Order 4-8, Rev. 1, IRM pt. 1.2.43.2 (Feb. 10, 2004), the Secretary delegated to personnel in the IRS that authority to issue a notice of deficiency. Those IRS personnel do not include Chief Counsel attorneys.

As described by the Department of the Treasury, the IRS is the "principal client" of the Chief Counsel.[16] The Commissioner of Internal Revenue and the

---

[15](...continued)
that begins at page 1 by stating: "This memo should not be cited as precedent"; that gives substantive advice about penalties to the Large Business & International Division of the IRS; and that concludes with a procedural point: "Note that the initial decision of whether to apply the penalty rests with the supervisor of the person proposing the penalty (e.g., the IRS case manager)"; and (2) Notice CC-2014-004 (May 20, 2014) (advising "that preassessment written supervisory approval is required when a Service employee makes an independent determination that the penalty should apply" and that "Chief Counsel attorneys should confirm that the initial determination" was approved). The notice simply refers to the approval that should be obtained "when" examination personnel make a determination. Neither of these documents states explicitly that a Chief Counsel attorney may never make such a determination.

[16]See https://www.treasury.gov/about/organizational-structure/offices/General-Counsel/Pages/irs.aspx ("The principal client of the
(continued...)

Chief Counsel are two of the few statutorily created offices "in the Department of the Treasury". Sec. 7803(a)(1)(A), (b)(1). Although the Chief Counsel "report[s] directly to the Commissioner", he also reports to the General Counsel for the Department of the Treasury. Sec. 7803(b)(3). Thus, the Chief Counsel and his attorneys are distinct from the Commissioner and his employees.[17] The role of the Chief Counsel and his attorneys is defined by statute, in section 7803(b)(2), as follows:

> (2)  Duties.--The Chief Counsel shall be the chief law officer for the Internal Revenue Service and shall perform such duties as may be prescribed by the Secretary, including the duty--
>
> > (A)  to be legal advisor to the Commissioner and the Commissioner's officers and employees;
> >
> > (B)  to furnish legal opinions for the preparation and review of rulings and memoranda of technical advice;
> >
> > (C)  to prepare, review, and assist in the preparation of proposed legislation, treaties, regulations, and Executive orders relating to laws which affect the Internal Revenue Service;

---

[16](...continued)
Office of the Chief Counsel is the Commissioner of the Internal Revenue Service").

[17]See also H.R. Conf. Rept. No. 105-599, at 210 (1998), 1998-3 C.B. 747, 964 ("The conference agreement provides that all personnel in the Office of the Chief Counsel are to report to the Chief Counsel (and not to any person at the IRS or elsewhere within the Treasury Department)").

    (D) to represent the Commissioner in cases before the Tax Court; and

    (E) to determine which civil actions should be litigated under the laws relating to the Internal Revenue Service and prepare recommendations for the Department of Justice regarding the commencement of such actions.

In fulfilling some of those duties, an attorney in the Office of Chief Counsel acts as a "legal advisor", sec. 7803(b)(2)(A); and in fulfilling other duties, the attorney is a decision-maker, as when "represent[ing] the Commissioner in cases before the Tax Court", sec. 7803(b)(2)(D); see infra part III.A.3.

   In September 2008 the Office of Chief Counsel became involved in this case--and advised the assertion of the 20% penalty--when it was called on to review the proposed notice of deficiency, pursuant to IRS routine.  See IRM pts. 4.8.9.7.1 (Dec. 1, 2006), 33.1.2.8 (Aug. 11, 2004).  Even in that circumstance, however, it remains true that--

> [t]he authority to issue a notice of deficiency rests with those Service officials delegated the authority by Servicewide Delegation Order 4-8 * * *.  The role of Area Counsel in this procedure is to provide advice on whether a notice of deficiency should be issued, and if so, to make recommendations concerning the issues to be asserted and the wording of the determination.

IRM 4.8.9.7.1(1) (emphasis added); see also, to the same effect, IRM pt. 33.1.2.8(1).  After examination personnel receive Chief Counsel's

recommendations about a proposed notice of deficiency, "[t]he Service is not bound by Counsel's opinion of the merits of the proposed notice". IRM pt. 33.1.2.8.4(1) (Aug. 11, 2004). Rather, in some circumstances the Service may "override * * * Area Counsel's advice". Id. pt. 4.8.9.7.2(1)(4) (Oct. 30, 2004).

Thus, the IRM describes the examiner's and the Chief Counsel attorney's functions differently: The examiner's role is "[t]he determination whether to assert penalties", id. pt. 4.10.6.1.1 (May 14, 1999), while the role of the Chief Counsel attorney "is to provide advice", id. pt. 4.8.9.7.1(1) (Dec. 1, 2006). This description is consistent with section 7803(b)(2)(A) (providing that Chief Counsel is a "legal advisor") and 26 C.F.R. section 601.105(b)(1), Statement of Procedural Rules ("original examination of income * * * returns is a primary function of examiners").

Therefore, when a Chief Counsel attorney is reviewing a proposed notice of deficiency and is advising the inclusion of a penalty liability therein, the attorney is not making a "determination" ("initial" or otherwise), for purposes of section 6751(b)(1); rather, he is giving legal advice to the person who will or will not make such a determination. The parties' stipulation is unequivocal on the

point that what Chief Counsel's September 2008 memorandum did was to give advice.[18]

It may be admitted that, like the Chief Counsel attorney, the examining agent lacks final authority to actually issue the notice of deficiency. One could characterize the agent's action in preparing the proposed notice of deficiency as a mere recommendation, with no more inherent effect than the attorney's legal advice, since the agent, too, arguably makes an act that may or may not be finally approved and effectuated. But the "initial determination" that is the subject of section 6751(b) is not a final section 6212(a) "determin[ation]" in a notice of

---

[18]See "Second Supplemental Stipulation of Facts" (Jan. 15, 2015), para. 106 ("Respondent's position is that, with respect to Area Counsel advisory memoranda, the docket attorney assigned to the case signs the advice" (emphasis added)), para. 109 ("Respondent's position is that the recommendation or advice to pursue the assessment of a penalty" (emphasis added)); para. 111 ("The Office of Chief Counsel has the delegated authority to advise Respondent as to the applicability of a penalty" (emphasis added)); para. 112 ("The role of [Chief] Counsel is to advise whether a deficiency notice should be issued, and if so, to make recommendations concerning the issues to be asserted" (emphasis added)); para. 113 ("Respondent's position is that Chief Counsel Attorney Gerard Mackey was assigned to review the SNOD issued to Petitioners in this case and was the first to recommend pursuit of the penalties by advising Respondent to assert the accuracy-related penalties in the SNOD to be issued to Petitioners" (emphasis added)); para. 114 ("Respondent's position is that Attorney Mackey's recommendation constituted the 'initial determination'" (emphasis added)); para. 117 ("There is no evidence in the administrative file that the Service declined to follow the Office of Chief Counsel's advice to assert the accuracy-related penalties" (emphasis added)).

deficiency but rather an <u>initial</u> determination by an "individual" that a penalty liability ought to be asserted. An administrative determination--even an "initial", non-final determination--is different in kind from legal advice given to another, advising him to make such a determination.

This difference between a determination, on the one hand, and legal advice about a determination, on the other hand, is borne out in the way the IRS does its business. For example, with respect to a penalty determination, "the IRS may wish to provide the taxpayer with a courtesy copy of the document showing that a manager approved the penalties [such as Mr. Feld's and Mr. Post's "Penalty Approval Form"]. Taxpayers are entitled to request these documents under the Freedom of Information Act." IRM pt. 20.1.1.2.3(7) (Feb. 22, 2008). But Mr. Mackey's memorandum giving legal advice, by contrast, bore the warning that "ANY UNAUTHORIZED DISCLOSURE OF THIS WRITING MAY HAVE AN ADVERSE EFFECT ON PRIVILEGES, SUCH AS THE ATTORNEY CLIENT PRIVILEGE." The giver of legal advice in a Chief Counsel memorandum evidently understands full well the distinctively advisory nature of his work.

In this case, the first documented mention of the 20% penalty was advice in a memorandum by a Chief Counsel attorney (approved by his immediate supervisor), but that advice did not constitute a "determination" of a penalty under

section 6751(b)(1).  Rather, it constituted advice that such a determination be made by the persons with authority to make it.  Thereafter, when the examination function followed that advice and revised the draft notice of deficiency to include the 20% penalty, the examining agent's immediate supervisor did not approve the penalty in writing.  Consequently, "[n]o penalty * * * shall be assessed", because the IRS did not comply with section 6751(b)(1).

### 3. The October 2014 amendment to answer

The Commissioner's alternative contention is that Chief Counsel's attorney's pleading the 20% penalty in the amendment to answer filed in this case in October 2014 (and the supervisor's approval of it) fulfilled the requirements of section 6751(b)(1).  Mr. and Mrs. Graev's answer to this contention is their argument that penalties can be determined only by examination personnel--and only in their first action in a case--and never by Chief Counsel.  If this argument were correct, it would contradict longstanding Tax Court practice and jurisprudence;[19] but as I noted above, this argument has no support in the actual

---

[19]The Commissioner routinely asserts section 6662(a) penalties in answers, and the Court has jurisdiction over them pursuant to section 6214(a).  In the case of a motion to assert penalties in an amended answer, the Court considers whether granting leave for the amendment would prejudice the taxpayer.  See Estate of Quick v. Commissioner, 110 T.C. 172, 180 (1998); Phillips v. Commissioner, T.C. Memo. 2013-215, at *3-*4.

text of the statute,[20] which bars assessment of a penalty only where supervisory approval was not obtained for the "initial determination of such assessment". Sec. 6501(b)(1). In the conduct of litigation, the Office of Chief Counsel does not have a merely advisory role but "represent[s] the Commissioner in cases before the Tax Court". Sec. 7803(b)(2)(D); see also sec. 7452 ("The Secretary shall be represented by the Chief Counsel"). In that role he is no mere mouthpiece but rather has the authority "to decide whether and in what manner to defend, or to prosecute a claim, or to settle, or to abandon a claim or defense therein". General Counsel Order No. 4, para. 4 (Jan. 19, 2001) reproduced in IRM Ex. 30.2.2-6 (June 25, 2013); see also IRM Ex. 30.2.2-6 (Aug. 11, 2004) (as in effect in 2008). It is clear that in that context the Office of Chief Counsel does not merely advise but rather makes a "determination" whether to assert a penalty liability; and if written supervisory approval is obtained, section 6751(b)(1) may be satisfied, notwithstanding the non-involvement of examination personnel.

However, it still remains that, in order to comply with section 6751(b)(1), it is the "initial determination" for which written supervisory approval must be

---

[20]Mr. and Mrs. Graev acknowledge that "[n]either the Code nor the Treasury Regulations explicitly specify the individual who may make the initial determination for purposes of section 6751". See Petitioners' Opening Brief, at 42 (Apr. 1, 2015).

obtained. If the initial determination of the penalty is made by a revenue agent before the notice of deficiency is issued, then the revenue agent's supervisor must approve the penalty in writing; or if the initial determination of the penalty is made in Tax Court litigation by a Chief Counsel attorney (through an answer or amended answer), then the attorney's supervisor must approve it in writing. I disagree with Mr. and Mrs. Graev that a penalty can never be initially determined in a Tax Court pleading that is approved by a supervisor; but I agree with them that an amended answer filed by Chief Counsel in litigation cannot cure the IRS's failure to comply with section 6751(b)(1) in connection with an initial penalty determination previously made by examination but not approved by the revenue agent's supervisor.

The text of the statute requires supervisory approval of the <u>initial</u> determination; and the purpose of the statute would be largely frustrated if an initial penalty assertion made improperly without supervisory approval could be rendered moot by a subsequent do-over. If the individual who made the "initial determination" failed to obtain supervisory approval, then the statute is not satisfied if thereafter another individual makes a <u>second</u> determination for which supervisory approval <u>is</u> obtained. Where the IRS fails to comply with section 6751(b) in connection with the "initial determination", that failure cannot be cured

by obtaining supervisory approval of a subsequent determination, because the rule is that "[n]o penalty * * * shall be assessed unless the <u>initial</u> determination * * * is personally approved (in writing) by the immediate supervisor".  Sec. 6751(b)(1) (emphasis added).

I would therefore reject the Commissioner's alternative position.

B.      <u>Failure to comply with section 6751(b)(1) is not "harmless error".</u>

As to the section 6751(a) issue, I agree with the majority, <u>see</u> op. Ct. pp. 23-24, that not every procedural lapse by the IRS invalidates its administrative acts. In this same vein, the Commissioner also now contends as to section 6751(b)(1):

> [P]etitioners have * * * failed to demonstrate prejudice from any claimed noncompliance, as required for the noncompliance to have any effect.
>
> When reviewing an administrative act or proceeding (or lack thereof), this Court has utilized "the 'theory of detrimental reliance' and considered the 'rule of prejudicial error' (otherwise known as the doctrine of harmless error)." <u>Scott v. Commissioner</u>, T.C. Memo. 2007-91 at *27; <u>see also</u> <u>Nestor v. Commissioner</u>, 118 T.C. 162, 167 (2002); <u>Rochelle v. Commissioner</u>, 116 T.C. 356, 363 (2001), <u>aff'd</u> 293 F.3d 740 (5th Cir. 2002). Under these doctrines, this Court has disregarded procedural omissions or errors unless there was prejudice to the complaining party. <u>See</u> <u>Scott</u>, T.C. Memo. 2007-91 at *27. The party seeking judicial review of an agency action bears the burden of demonstrating prejudice from any error. <u>Id</u>.; <u>Boyd v. United States</u>, 121 Fed. Appx. 348, 350 (10th Cir. 2005), <u>affg</u>. 322 F. Supp. 2d 1229 (D.N.M. 2004).

The Commissioner thus argues that, even if we find that the IRS failed to comply with section 6751(b)(1), that failure was "harmless error" that should not affect Mr. and Mrs. Graev's liability for the penalty.[21] I acknowledge that, especially since the 20% penalty is founded on a "substantial understatement" that exists as a largely computational matter pursuant to section 6662(b)(2) and (d)(1)(A), they cannot show specific "prejudice" resulting from the lack of written approval by

---

[21]Judge Nega's concurring opinion takes essentially the same tack. Because the concurrence seems to emphasize that the unapproved 20% penalty was less in amount than the approved 40% penalty, it should be noted that the IRS has not argued that the unapproved 20% penalty is somehow a "lesser included" component of the approved 40% penalty. The predicates for these two penalties are quite distinct: The section 6662(h) penalty for which approval was obtained in this case turns on the presence of a "gross valuation misstatement" regarding the property for which a deduction is claimed on the return. The section 6662(a) penalty for which approval was not obtained turns on the negligence of the taxpayer (or on the amount of the understatement of income tax). Someone determining or approving the penalty for a gross valuation misstatement of contributed property would make a factual inquiry completely different from the inquiry appropriate for determining or approving a penalty for negligence or a substantial understatement of income tax. A given taxpayer whose return reflected a gross valuation misstatement might or might not be liable for the negligence penalty. The "Penalty Approval Form" that the IRS promulgated for the purpose (and which Revenue Agent Feld used) treats the 20% penalty and the 40% penalty as distinct penalties. Under the caption "Penalty", the form lists 16 lines that cite Code sections and name possible penalties. One line reads "6662(h) / Gross Valuation Misstatement", and Mr. Feld marked that line with an "X". Three other lines referred to "6662(b)(1) / Negligence", "6662(b)(2) / Substantial Understatement", and "6662(b) / Other Accuracy Related"; and Mr. Feld marked none of those three. Under the caption "Other" there were two lines. One line read "Alternative Penalty Position", and the other read "Abatement of Assessed Penalties". Mr. Feld made no marks on these lines.

Mr. Feld's supervisor; but I do not agree that this fact renders the failure "harmless" and without effect on the liability.

The cases that the Commissioner cites involve procedural requirements--i.e., requirements that a notice "shall include * * * a computation of the interest" (sec. 6631, cited in Scott v. Commissioner, T.C. Memo. 2007-91, aff'd, 262 F. App'x 597 (5th Cir. 2008)), that the IRS "shall furnish the taxpayer a copy of the record of the assessment" (sec. 6203, cited in Nestor v. Commissioner, 118 T.C. 162, 166-67 (2002)), that a notice of deficiency "shall include * * * the date determined by such Secretary (or delegate) as the last day on which the taxpayer may file a petition with the Tax Court" (1998 Act sec. 3463(a), 112 Stat. at 767, cited in Rochelle v. Commissioner, 116 T.C. 356, 359 (2001), aff'd, 293 F.3d 740 (5th Cir. 2002)), and that the IRS "shall * * * allow the taxpayer to make an audio recording of such interview" (sec. 7521(a)(1), alluded to in Boyd v. United States, 121 Fed. Appx. 348, 350 (10th Cir. 2005))--that are very different from the statute at issue here. In those cases, the statute that imposed an obligation on the IRS made no provision for any "consequence for noncompliance", United States v. James Daniel Good Real Prop., 510 U.S. 43, 63 (1993), that would result from a failure to meet that obligation.

Section 6751(b)(1), on the other hand, is quite different. It starkly provides a "consequence for noncompliance": "No penalty * * * shall be assessed unless" supervisory approval is obtained. Plainly, this is a bar to assessment--an explicit and definitive consequence that Congress imposed for this particular procedural violation. The statute of limitations on assessments itself is not worded more emphatically than section 6751(b).[22] If, as Mr. and Mrs. Graev allege, the IRS failed to comply with section 6751(b), then that failure very much affects our redetermination of their liability for the penalty. Where a liability is assessed a mere one day late--or one hour late--in violation of section 6501(a), the courts enforce the statute of limitations without exploring whether the taxpayer was actually prejudiced by the trivial delay. Where a taxpayer files his Tax Court petition a mere one day late in violation of section 6213(a), we dismiss the petition without inquiring whether the IRS's ability to defend against that petition was actually prejudiced by this mere footfault. Instead, we follow the law and impose the consequence that Congress provided.

Where Congress has decreed that the consequence of non-approval is that "[n]o penalty * * * shall be assessed", we cannot interpose our judgment that in a

---

[22]See sec. 6501(a) ("the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed").

given instance the non-approval was harmless or non-prejudicial and that therefore the penalty <u>shall</u> be assessed. Congress enacted a prophylactic remedy for "bargaining chip" abuse--to wit, non-assessment of the unapproved penalty, without regard its merit--and we cannot replace that remedy with one we prefer (i.e., judicial review of the merits of the unapproved penalty). A taxpayer who can show that the penalty was not approved in writing by the supervisor should not be put to the burden of proving the merits of the penalty issue. No penalty shall be assessed. I would hold that a failure to obtain the supervisory approval required by section 6751(b) bars an assessment, and that the omission of that approval cannot be excused as a "harmless error".

The "initial determination" of the 20% penalty was not "personally approved (in writing) by the immediate supervisor" as required by section 6751(b)(1). Consequently, "[n]o penalty * * * shall be assessed ". <u>Id.</u> I would so hold.

COLVIN, VASQUEZ, MORRISON, and BUCH, <u>JJ.</u>, agree with this dissent.